[No. S015008. Aug. 25, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
MARK LINDSEY SCHMECK, Defendant and Appellant.

**COUNSEL**

Cliff Gardner, under appointment by the Supreme Court, and Catherine White for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Ronald S. Matthias and Violet M. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**GEORGE, C. J.**—A jury found defendant Mark Lindsey Schmeck guilty of the first degree murder of Lorin Gwynne Germaine (Pen. Code, §§ 187, subd. (a), 189)[1] and of second degree robbery (§ 211). The jury also found true the allegations that defendant killed the victim while engaged in the commission or attempted commission of a robbery (former § 190.2, subd. (a)(17)(i), now § 190.2, subd. (a)(17)(A)), and personally used a firearm in committing the murder and the robbery (§ 12022.5 as amended by Stats. 1988, ch. 1249, § 3, p. 4161). The jury set the punishment at death.

The case is before us on defendant's automatic appeal. (Cal. Const., art. VI, § 11; Pen. Code, § 1239, subd. (b).) For the reasons that follow, we affirm the judgment.

## I. FACTS

### A. Guilt phase

The prosecution proceeded on the theory that defendant sought out a motor home to steal, and then robbed and murdered Lorin Germaine in the course of

---

[1] All further statutory references are to the Penal Code, unless otherwise designated.

stealing his motor home. The defense theory was that Jamie Gronley (defendant's girlfriend), Donald Willis, and perhaps William Duffy committed the murder and robbery, and that following the murder, defendant unwittingly had merely attempted to sell the motor home.

### 1. *Prosecution evidence*

On the morning of May 30, 1986, Lorin Germaine left his Fremont residence to meet a prospective buyer for his motor home. On June 5, 1986, Germaine's body, with four or five bullet wounds in his head, was discovered on a road near Sunol.

In May 1986, Lorin and his wife Rebecca Germaine placed an advertisement in Auto Trader magazine to sell their 1978 22-foot Dodge Brougham motor home, which had mileage of 38,000, for $14,000. Approximately 8:30 p.m. on Monday, May 26, Rebecca answered a telephone call from a man who said he had seen the advertisement in that magazine and was interested in buying the motor home. Rebecca handed the telephone to Lorin. On Tuesday, May 27, at approximately 6:00 a.m., Rebecca received a telephone call from the same man about the motor home, and again handed the telephone to Lorin. Afterwards, Lorin told Rebecca that during his lunch hour Lorin was going for a test drive in the motor home with the man who had telephoned. Prior to May 30, Rebecca recalled that the caller's name was Mark, but her two children believed his name was Mike.

On the evening of May 27, Lorin told the family's babysitter, Carey Gilchrist, that the prospective buyer had mentioned that an aunt had died and left him $85,000, which was being managed by his sister. Later the same evening, Lorin told Rebecca that during the test drive the prospective buyer had commented that Lorin "looked really familiar and he asked him if he had a younger brother, that [the prospective buyer] thought that he knew [Lorin's] younger brother." Rebecca testified that in fact Lorin had a younger brother who looked "[e]xactly like him." Dennis Trede, a friend of the Germaine family, later testified that in April, 1986, defendant and Trede had been in the same holding cell in the municipal courthouse. Lorin's younger brother, John Germaine, appeared at the courthouse to visit Trede, and defendant made a comment about John Germaine to Trede.

On Wednesday, May 28, Rebecca emptied the motor home of all of their personal belongings, vacuumed the carpet, and washed the interior and exterior. On Thursday, May 29, Rebecca and Lorin went to the Department of Motor Vehicles (DMV) and obtained the necessary documents to transfer title to the motor home. At trial, Rebecca identified the release of liability form that she and her husband completed, but she did not recognize the printing of

the name for the buyer, Martin R. Freitas, whom the form identified as the ostensible purchaser of the vehicle.

At approximately 6:00 a.m. on Friday, May 30, Rebecca answered another telephone call from the same man about the motor home, and she handed the phone to Lorin. This individual telephoned approximately one hour later, and Rebecca again handed the telephone to Lorin. Lorin drove their children to school. He returned to their home, spoke to Rebecca for a few minutes, and retrieved the DMV documents and keys to the motor home. Lorin also had a trifold wallet containing approximately $40 in cash and other items, including his Kaiser medical identification card. At approximately 8:30 a.m., Lorin departed in the motor home to meet the buyer at A Street and Grand in Hayward to finalize the transaction.

During May, defendant made several statements that related to obtaining and selling a motor home. In that month, defendant sanded and painted the kitchen and dining area at the residence of Henria (Wanda) Wilson and Melba Valdez. Wilson saw defendant making telephone calls with an Auto Trader magazine in his hand. Between May 16 and May 27, defendant asked Wilson and Valdez whether they knew anyone who wanted to buy a mobilehome for approximately $7,000, and offered to pay them $200 if they located a buyer. After his release from jail on May 16 and prior to May 30, defendant told Jamie Gronley, his girlfriend, that he wanted to acquire a motor home. Between those dates, defendant also told his friend William Duffy that defendant had a plan to make money, in which he would "pretend [to] buy a motor home out of a newspaper and he would put the gun to the owner's head and insist that the owner sign over the pink slip to him or he would blow him away." On May 27, defendant told an acquaintance, John Maartense, he was going to obtain a motor home. When Maartense inquired how defendant would purchase a motor home without having a job, defendant replied, "I have my ways."

At approximately 2:00 p.m. on May 27, a person identifying himself as Mark Schmeck telephoned Nohr's R. V. Center in Dublin. Phillip Sipes answered the telephone. The caller asked whether Nohr's was purchasing motor homes at that time, and whether they could make a quick deal. The caller stated that he was selling a 1978 22-foot Brougham motor home having approximately 39,000 miles. Sipes informed the caller that the Kelly Blue Book value of that vehicle was approximately $8,000 at wholesale, and $11,000 at retail, and that once Sipes inspected the vehicle, he could make a deal the same day. Sipes testified that his May 27 telephone log contained the following notation: " '78 22-foot Brougham 39,000 miles, Mark Schmeck."

Evidence was introduced concerning defendant's activities on May 30, the day of Lorin Germaine's disappearance. Between approximately 10:30 a.m.

and 11:30 a.m., defendant appeared at the parking lot of an apartment complex where Jamie Gronley was assisting her acquaintance, Edward Tanner, move. Defendant spoke to Gronley for approximately five to 10 minutes and appeared to be upset. Defendant told Gronley that he was attempting to sell a motor home, but first had to take it to be cleaned at a car wash.

On the same day between 10:30 a.m. and 11:00 a.m., a person identifying himself as Mr. Schmeck telephoned Phillip Sipes at Nohr's R. V. Center, reporting that he was running a bit late and would be in later. Sipes's telephone log of May 30 contained the notation: "Mark—Be In Around 1:00 Brougham." At approximately 1:00 p.m., a person telephoned Sipes and identified himself as Mark, and stated he was running late because he had run out of gasoline, but would be there in another hour or so.

Between 2:00 p.m. and 2:30 p.m. on May 30, Sipes noticed a 1978 22-foot Brougham in the Nohr's RV Center parking lot. A man identified at trial as defendant asked to see Phillip Sipes, identifying himself as Mark Schmeck. Sipes recognized defendant's voice as that of the man who had telephoned him on May 27 and earlier that day, May 30. Defendant was shirtless but soon donned a jacket. Sipes looked inside the motor home and noticed that a section had been cut out of the carpet. Defendant stated he had cut out that part of the carpet because it was in poor condition. Defendant acted very "hyper, jumping around, wiping the walls down." Although defendant said he would "take any kind of offer" for the motor home, Sipes was not interested in it at any price. Sipes suggested defendant try Lee Peterson's Motor Home Sales.

At approximately 3:00 p.m., a man identified at trial as defendant told a salesman at Lee Peterson's Motor Home Sales that he had a motor home to sell "cheap." Defendant stated the motor home had a book value of $8,000, but he would take $2,000 for it right then. Paul Weber, who was at the dealership purchasing propane, overheard this conversation. Weber followed defendant, who said his name was Martin Freitas, and asked him about buying the motor home. Defendant asked Weber whether he had cash in the bank, and allowed him to inspect the motor home. In Weber's truck, they drove to two different automatic teller machines, and Weber gave defendant $300 in cash. Weber agreed to pay defendant a balance of $1,200. Defendant gave Weber the motor home and several documents, including the pink slip, a bill of sale, a certificate of nonoperation, and a registration renewal form.

Later on May 30, Weber made efforts to determine whether defendant was the legitimate owner of the motor home. Weber subsequently met with Rebecca Germaine and accompanied her and her friends to the Alameda

County Sheriff's Department, San Leandro Office, where Weber assisted in the preparation of a composite drawing of defendant. On Saturday, May 31, Dennis Trede saw the composite drawing, and he ultimately recognized the person depicted as defendant.

Weber assisted the police in apprehending defendant. When defendant telephoned Weber several times, asking him to deliver the balance of $1,200 to "Stephanie Freitas," Weber refused and stated that he only would deal with defendant personally. One of the conversations, recorded on Weber's father's answering machine, was played for the jury. Ultimately Weber and defendant agreed to meet at 2:00 p.m. on June 1. The police equipped Weber with a "wire" in order to record sound, and instructed him to signal officers by removing his glasses. When defendant appeared, Weber gave the signal, and defendant was arrested on suspicion of vehicle theft.

Defendant made several statements connecting him to the commission of the crime. Following his arrest on June 1, defendant was interviewed by the police. Defendant was breathing hard, moving around a lot, and "seemed hyper, nervous." Defendant initially denied any involvement with the stolen motor home, noting that he expected to inherit $85,000 in the coming months. When confronted by the circumstance that he had been identified as having been inside the motor home, defendant stated, "I'm gonna talk." Defendant maintained that on May 29 or 30, a person named "Don," whose last name defendant did not know, had approached defendant about getting rid of a motor home that Don had inherited. Initially, defendant told the police that he merely looked at, but did not drive, the motor home. When the police mentioned that three persons had identified defendant as having been inside the motor home, defendant stated, "[O]kay, now I'm gonna tell you everything." Defendant admitted driving the vehicle on May 30 and stated that Don had offered to pay defendant $200 to sell it. Don wanted a "quarter pound" (an apparent reference to drugs by weight), which was worth approximately "three or four thousand dollars," for the motor home. Defendant stated he took the motor home to Nohr's RV Center and Lee Peterson's Motor Home Sales, and eventually someone named Paul offered to buy the vehicle.

Between 4:00 and 6:00 p.m. on May 30, defendant told Jamie Gronley he had shot and killed a man in order to obtain his motor home. The killing took place inside the motor home on C Street in Hayward behind the BART station, in an industrial area. Defendant stated that he used the bathroom, and when he returned he shot Mr. Germaine in the head. Germaine grabbed his head, turned, looked at defendant, and asked him what he was doing. Whenever Germaine moved or attempted to say something, defendant shot him again. Defendant shot Germaine five times in the head. As defendant told

Gronley about the murder, he began to cry. Defendant had a trifold wallet that, as he told Gronley, belonged to the victim. Defendant changed his clothes, and he and Gronley went to the laundromat.

That weekend, defendant told Gronley that if he were arrested for murder, he would implicate his enemy "Don," who resembled defendant in height, hair color, mustache, and beard. Following his arrest, defendant asked Gronley to marry him so that she would not have to testify. Defendant also asked her to write statements incriminating Don, because defendant knew his mail was being read. Subsequently, Gronley wrote to defendant, "Remember babe, they can't convict you of something you didn't do. I know you didn't kill him. Just pray they find Don." At trial, Gronley testified that Don was not involved in the murder.

On the evening of June 4, defendant telephoned Gronley at Detton's Bar and asked her to move Germaine's body. Defendant stated that if she followed Foothill Road until it became another road, then she would locate the body between a hairpin turn and an impassable bridge. The description was consistent with an area near Gronley's grandmother's residence that defendant had visited previously. Gronley became hysterical, and William Duffy, who was present with Gronley, contacted the police. On June 5, Gronley and Duffy accompanied the police to Foothill Road near Sunol. Germaine's body, which had an odor of rotting flesh, was discovered on a ledge below the roadway.

Gronley testified that she had contacted the police on June 3 and had confessed that she had killed Germaine. During the police interview, Gronley was unable to describe Germaine and had never seen the motor home. She stated that two bullets had penetrated the windshield, a fact not reported by any witness who had inspected the motor home during defendant's sales efforts on May 30. Gronley reported that the body was located near a construction site on Acosta Boulevard in San Ramon. Following the interview, Gronley received a negative response to her inquiry whether the officers believed her. Gronley testified that she had confessed because she was in love with defendant and somehow felt responsible for Germaine's death.

Following his arrest, defendant made two telephone calls to Beverley Dupio, a friend of Gronley's with whom defendant was acquainted. In the first conversation, defendant told Dupio that "he made a mistake of killing this man but he didn't think he deserved 15 years for it." In the second conversation, defendant sought Dupio's assistance in arranging for defendant and Jamie Gronley to get "married so she can't testify against him." Defendant also telephoned Wanda Wilson and requested that, should anyone call her and ask "if [defendant] used a lot of drugs to say yes."

Certain physical evidence also connected defendant to the murder. At the time of his arrest on June 1, defendant wore a black jacket, which had a bloodstain possessing genetic markers that were consistent with Germaine's blood but inconsistent with defendant's. Blood consistent with the victim's was found on the carpet and the inside shower door of the motor home. Defendant's fingerprints were found on a plastic cup inside the motor home and on the DMV registration renewal form.

During several searches of William Duffy's apartment, where defendant and Gronley stayed the night following the victim's disappearance, the police found a .22-caliber revolver, identified as belonging to defendant, behind a drawer. On the evening of May 30, Gronley observed defendant wiping down the gun and attempting to stuff something into the barrel, stating that would change the markings on "something like" the bullet shells. Ballistics evidence confirmed that two bullets removed from the victim's head were fired from that gun. A third bullet removed from the victim had markings consistent with having been fired from that gun, but had insufficient detail to make a match. On the evening she observed defendant with the gun, Gronley found approximately five empty shells, which she placed into beer cans. Subsequently, the police found two spent .22-caliber cartridges in an empty beer can outside in the apartment trash.

In attic areas of William Duffy's apartment building, the police found a DMV release of liability form bearing the names Martin Freitas, Lorin Germaine, and Rebecca Germaine, a bag with six .22-caliber rounds of live ammunition, a portion of the victim's Kaiser identification card, and defendant's black baseball cap, which he had been seen wearing on Friday, May 30.

In an effort to disprove the defense theory of the case, the prosecution introduced evidence to establish the whereabouts of Donald Willis and Jamie Gronley on May 30. Willis testified that on that date, he went to his sister Janice Suacci's residence in Santa Rosa, and did not at any time between May 30 and June 2 leave Santa Rosa and go to Hayward. His sister testified that she saw Willis sometime after 5:00 p.m. on May 30. Edward Tanner, his brother George, and Gronley testified that Gronley spent the morning of May 30 helping Edward Tanner move out. At approximately 12:30 p.m., Edward Tanner dropped off Gronley at William Duffy's apartment. Duffy and Gronley testified that they spent the afternoon together.

A fingerprint expert testified that he compared the identifiable but unmatched latent prints found on the documents related to the motor home with the fingerprints of Donald Willis and concluded that none matched.

## 2. *Defense evidence*

Detective Muniz found a second gun in the attic crawl space outside William Duffy's apartment. The weapon was a very old, single-shot, .50-caliber, ball-and-cap type, and Muniz did not turn it in for ballistics or fingerprint testing. During Muniz's interview with Wanda Wilson, she said that defendant had left her residence after 12:30 p.m. on May 27.[2]

On May 30, Officer Jim Fontes of the Fremont Police Department took a missing person's report from Rebecca Germaine, who described the possible suspect as a White male, about 28 years of age, six feet tall, 170 pounds, of medium complexion, without facial hair, with long dark hair tied in a bun and a ponytail extending from the bun. Rebecca stated that the suspect's name was Mike or something similar, and that he was going to pay for the motor home with money from a $15,000 trust fund. Rebecca personally did not observe the suspect, but had obtained the description from one of her husband's coworkers.

Monica Hall, defendant's aunt, testified that on April 4 she summoned the police to a residence she owned, where defendant and Gronley were living without her permission. Hall subsequently found paperwork inside the residence with handwriting that appeared to be Gronley's, apparently containing directions to an area near the location where Mr. Germaine's body was found. Hall believed that in April 1986, defendant wore his hair straight down, and she never had seen him with a bun or a ponytail.

Sally Hughes, Pacific Bell's custodian of records for Northern California, testified that during the period of mid-May to mid-June 1986, only one collect telephone call (on June 7) was received at Detton's Bar, from South Lake Tahoe. Between mid-May and mid-August 1986, there were no collect telephone calls from the men's facility at the Santa Rita Jail to Beverly Dupio. During June and July 1986, eight collect telephone calls were made from the women's holding unit or dormitory at Santa Rita jail to Dupio.

## 3. *Rebuttal evidence*

Between April and May 1986, Gronley received a number of telephone calls from defendant while he was incarcerated in the Santa Rita Jail. When Gronley asked defendant how he could telephone from the jail without calling collect, defendant said he used a satellite or calling card number.

---

[2] During the prosecution's case-in-chief, Wilson testified that defendant left the residence at approximately 9:00 a.m. on May 27.

Raymond Ruiz, a product manager at Pacific Bell, testified that starting in the fall of 1985 through the summer of 1986, the company received complaints from long distance carriers concerning telephone calls that were being made from a number of penal institutions such as Santa Rita Jail, and were being billed to the carrier. Ruiz testified it was possible to reach a long distance carrier from a public telephone in several ways, including the use of a personal identification number or a seven-digit number beginning with "950." Pacific Bell made efforts to block such calls.

Mark Ferrara, a security investigations administrator at Pacific Bell, testified that the company had received complaints about fraudulent use of satellite codes by inmates. A telephone call that was made utilizing a satellite code would not appear as a collect call on the recipient's telephone records.

Deputy Sheriff James Donnelly testified that on June 4, 1986, the Santa Rita compound in which defendant was incarcerated had coinless telephones that were available to inmates at all times.

### B. *Penalty phase*

#### 1. *Prosecution evidence*

Documentary evidence was introduced that in 1984 defendant had suffered a prior felony theft conviction in the State of Washington.

#### 2. *Defense evidence*

Several family members testified regarding defendant's childhood and youth. Defendant's father, Frank Schmeck, worked as an instrument technician at the Alameda Naval Air Station. Defendant was born on February 3, 1957. Six months later, defendant's mother, Jacqueline, left Frank, taking with her defendant and his older sister, Lonnie. The children continued to have regular contact with Frank until defendant was approximately five years of age, when Frank remarried and moved to Washington. When defendant was about six or seven years of age, Jacqueline married Bill Freitas.

Jacqueline was a hypochondriac and spent a great deal of time in bed during the day. Defendant and Lonnie were forced to make their own breakfast and lunch, and to do other chores around the house. When Lonnie was only in the second grade, she registered defendant for kindergarten. When defendant was seven years of age, Jacqueline would disappear for up to two weeks at a time. Jacqueline treated defendant well, but was not kind to Lonnie. When defendant was approximately nine years of age, Jacqueline on several occasions threatened her children with a weapon, and she attempted

to stab defendant with a knife and a fork. By the time Lonnie was a teenager, the immediate family ascertained that Jacqueline had a substance abuse problem, for which Jacqueline ultimately received treatment. When Jacqueline was shot to death in 1979, defendant was traumatized.

Defendant's stepfather, Bill Freitas, was verbally and physically abusive to defendant, hitting him several times a month during a five- or six-year period. Defendant never struck back.

When defendant was 16 years of age, he moved to Washington to live with his father, his father's second wife, and their adopted son, Frankie. Although defendant initially skipped classes at school, he stopped doing so as the result of his father's efforts. Defendant was not a discipline problem, and his father never struck him. Defendant was a member of several varsity sports teams, and shortly before his graduation he began to work at a local McDonald's restaurant. Defendant had a close relationship with his stepbrother, Frankie. Defendant opposed the use of drugs and alcohol, which influenced Frankie never to try using these substances.

Defendant resided with his father until after defendant's graduation from high school, when he found his own apartment nearby. Subsequently, defendant moved in with his sister Lonnie for approximately one year. Defendant worked at two jobs during this period. Defendant married Michelle Sather in 1978, and they moved to Washington. The couple owned their own home, and defendant had his own automobile body-and-fender-work business. Several years later, defendant and Michelle divorced, and defendant had a son, Justin, with another woman, Mary Isenman. In 1985, defendant left Mary and started seeing a woman named Jamie (presumably Jamie Gronley).

Defendant's high school football coach, a fellow member of the football team, and defendant's ex-wife all testified regarding defendant's nonaggressive character. Defendant's stepbrother Frankie and defendant's ex-wife described defendant's thoughtfulness.

When defendant's sister Lonnie saw defendant in February 1986, defendant was gaunt and had a greenish-yellow pallor to his skin. Lonnie suspected he was using drugs.

Dr. Stephen Pittel, a psychologist, testified generally about the effect of amphetamines, including methamphetamines. A person who, during the afternoon, is hyperactive, sweating, rubbing his hands together, and talking to himself, would exhibit symptoms consistent with methamphetamine use, but probably those symptoms would not have been caused by use of that drug during the previous night. Sweating, hand rubbing, and hyperactivity could be

caused by many things other than amphetamine use, however. A person who is nervous and excitable, and experiences sudden weight loss and has a greenish-gray pallor to his or her skin, would exhibit signs consistent with the chronic use of methamphetamine or some other stimulant. A person who engages in chronic amphetamine use can become fearful and suspicious to the point of arming oneself. Dr. Pittel did not interview or test defendant. Dr. Pittel reviewed the preliminary hearing transcript in the present proceedings but, with the possible exception of one brief excerpt, did not review the trial transcript.

Jerry Enomoto, a former Director of the Department of Corrections, testified that a person serving a sentence of life imprisonment without possibility of parole is permitted to work in prison, and that such work can have a rehabilitative effect.

## II. DISCUSSION

### A. *Pretrial issues*

#### 1. *Asserted erroneous excusal of prospective jurors*

Defendant contends that his death sentence must be reversed because the trial court erroneously excused for cause four prospective jurors based upon their views concerning the death penalty, in violation of defendant's rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.[3]

##### a. *Factual background*

###### i. *Prospective Juror R. V.*

During sequestered *Hovey* voir dire,[4] the trial court asked Prospective Juror R. V., "Do you know of any reason why you could not be a juror in this case?" The juror responded, "Well, I consider execution by the state a sort of barbaric ritual and would find it difficult to render a judgment that would say

---

[3] Although defendant also asserts that his conviction must be reversed on this basis, an erroneous excusal of a prospective juror based upon his or her views regarding capital punishment would result in the reversal only of the death sentence. (*Gray v. Mississippi* (1987) 481 U.S. 648, 668 [95 L.Ed.2d 622, 107 S.Ct. 2045] (*Gray*).)

[4] The 1989 trial in the present case preceded the passage of Proposition 115 in 1990, and therefore was governed by *Hovey v. Superior Court* (1980) 28 Cal.3d 1, 80 [168 Cal.Rptr. 128, 616 P.2d 1301] (*Hovey*). All prospective jurors whose exclusion forms the basis of a challenge on appeal were questioned during the *Hovey* voir dire (that portion of the voir dire in which a prospective juror is questioned concerning his or her views pertaining to the death penalty in the absence of the other prospective jurors).

a particular person should be executed by the state. I consider that a tad hypocritical of the state trying to say that murder is wrong and turn around and kill a citizen." Prospective Juror R. V. stated he would not have any trouble making a judgment of fact, such as would occur at the guilt phase of the trial. He added, "[B]ut it[] seems that that final stage would be a determination of whether or not the moral quality of someone is such that this person deserves to be executed by the state and considering execution rather a sort of barbaric act it would . . . require a sort of extremely heinous moral quality on the part of the defendant to deserve such a barbaric treatment so . . . . If the final phase is simply [a] judgment of fact then there wouldn't be any problems I don't think. If the final phase is a moral judgment that says the moral character of this person is such that this person deserves to be executed I would have to—have difficulty rendering a judgment like that." The trial court then stated that, as it understood Prospective Juror R. V.'s statements, "you are not concerned that your views of the death penalty would [a]ffect your ability to render a verdict in the first part of trial . . . but you are concerned because of your views as to how that might [a]ffect your ability to serve in the second phase of the trial, is that true? And your ability to serve on a jury in a case other than this type would not be [a]ffected but this one might be?" Prospective Juror R. V. responded: "This is true."

In response to questioning by defense counsel, Prospective Juror R. V. posed the question, "[W]hen you are putting this on the scale of values how do you draw the line as far as determining whether or not someone should be executed or put away for life?" After a lengthy response by counsel regarding the weighing of aggravating and mitigating circumstances, and discussion between counsel and the court, Prospective Juror R. V. stated: "Presently I see that if someone is permanently removed from society and no longer a danger to citizens I don't see any reason for going through with further acts of barb[ar]ism, that is an execution. So I don't see the circumstances under which I could make the judgment that so and so should be executed." Defense counsel subsequently asked, "[T]here is no set of circumstances either about the crime or about the defendant or about the both of them under this general factual outline that the court has given of this case under which you could vote for the death penalty?" Prospective Juror R. V. responded, "The reason I find it difficult to imagine right now is if someone is permanently removed from society and no longer a danger to any of his or her fellow citizens, what would be the rationale for executing the person? . . . I don't see the rationale at the moment." Prospective Juror R. V. acknowledged, "The proponent could present arguments for execution that I haven't heard or considered enough to convince me that so and so should be executed so presently I lack that rationale and in the course of the proceedings the prosecution could present the rationale for execution that could convince me."

Prospective Juror R. V. was then questioned by the prosecutor, who asked, "[I]s Hitler one of those types of people that you might consider voting for the death penalty if he were still alive?" Prospective Juror R. V. responded, "Well, if I was convinced that there is some way he could be broken out of prison then I could vote for the death penalty for Hitler." When asked whether he ever could imagine voting for the execution of a person who intentionally killed during a robbery, Prospective Juror R. V. said, "Right now I do not imagine myself voting for an execution. That does not rule out a very convincing presentation by the prosecution that would change my mind." Prospective Juror R. V. agreed that he had "a strong bias against the death penalty law," and stated that he voted against and disagreed with such laws. When asked whether there was any practical situation in which he could see himself imposing the death penalty, R. V. stated that not only would he have to be convinced that defendant had committed a rather heinous crime and that there were very few possibilities of repentance and rehabilitation, but also "that in the last section of the trial that I'm rendering a judgment of facts according to the law and not making a moral statement that the death penalty is good."

When the prosecutor challenged Prospective Juror R. V. for cause pursuant to *Wainwright v. Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844] (*Witt*), the trial court sustained the challenge over defense objection, explicitly finding "from this juror's demeanor and responses that this juror's views would prevent or substantially impair his ability to be neutral and follow the court's instruction." After defense counsel reiterated his objection, the trial court added that "after viewing the questioning of [R.V.] as a whole, I was left . . . with the definite impression that he would be unable to faithfully and impartially apply the law . . . ."

### ii. *Prospective Juror M. M.*

In response to the trial court's questioning, Prospective Juror M. M. stated, "I really strongly feel I'm not sure that I could under any circumstances vote for the death penalty." The court inquired whether she was concerned "that if there were a penalty phase in the trial that you would not enter that phase in a neutral position as it were?" She responded, "Yes." Defense counsel subsequently asked, "Are there certain types of cases, certain types of factual situations where you feel the death penalty would be appropriate?" Prospective Juror M. M. responded, "I don't think so. I mean I have concerns. I feel strongly against the death penalty. However, it gets a little gray, especially where there are crimes against women and children, so but morally I'm against the death penalty." Defense counsel asked, "Do you feel . . . there are certain situations where you could feel it was appropriate?" Prospective Juror M. M. said, "I'm not sure. I've been trying to figure this out since last week

and I'm not sure how . . . it would come out. So I think that I feel very opposed to the death penalty. So I think that I would tend to go more in that direction. I don't know how to be any clearer than that." When the prosecutor challenged Prospective Juror M. M. for cause under *Witt, supra*, 469 U.S. 412, defense counsel responded, "submitted." The trial court sustained the challenge.

### iii. *Prospective Juror M. W.*

In response to the court's inquiry as to whether there was any reason she could not serve as a juror in the case, Prospective Juror M. W. stated, "I don't know that in the end if I could really vote for the death penalty. . . ." The court inquired, "[A]re you telling me . . . you are concerned that you would be unable regardless of the facts and circumstances presented in the second phase that you are concerned you would have difficulty regardless of what those facts and circumstances were considering or voting for the death penalty, am I understanding you correctly?" Prospective Juror M. W. responded, "Yeah. Not so much what I would think in the guilt phase but actually having to decide the death penalty." The court inquired, "You don't think you could do that?" Prospective Juror M. W. responded, "I don't think I could do it." The court subsequently inquired: "But the point is whether you in fact could make a choice or exclude one of those choices because of your state of mind. That's the question." Prospective Juror M. W. responded, "This is so hard for me. I know it is California law and a lot of times things that I read in the paper I say of course I believe in the death penalty. You know honestly I feel like I might have to exclude that as one of my choices."

Defense counsel, referring hypothetically to an "extreme case" in which "your conscience as an individual says there is no redeeming factor about this situation," inquired: "[C]ould you bring yourself to say I don't think that person should live any longer and you could sign [a]long with the other 11 people a verdict that says the death penalty?" Prospective Juror M. W. responded, "I don't feel I could. I wish I could say that I could do that but—" Defense counsel subsequently inquired: "I guess the bottom line after we have kicked this around what say you if the circumstances demanded it if the aggravating factors substantially outweighed the mitigating circumstances could you go into that situation and give it a fair shot as to both sentencing choices, that's what it boils down to?" Prospective Juror M. W. replied, "I don't think I could."

The prosecutor challenged Prospective Juror M. W. for cause under *Witt, supra*, 469 U.S. 412, and defense counsel responded, "submitted." The trial court sustained the challenge.

### iv. *Prospective Juror H. L.*

Prospective Juror H. L. was asked by the trial court, "[D]o you see any reason why you could not serve on this jury?" The prospective juror responded, "Well, in my conscience I don't believe in the death penalty in most cases. Under very rare circumstances would I ever consider the death penalty." The court stated, "[L]et me ask you this. Is it your state of mind, is it such that you could never vote for the death penalty regardless of what circumstances might be presented to you?" Prospective Juror H. L. replied, "Of a case of this kind definitely." The following colloquy ensued: The court: "That is your state of mind?" H. L.: "Yes." The court: "You could not in a case such as this vote for the death penalty regardless of what circumstances, aggravating and mitigating circumstances would be presented?" H. L.: "That is correct. . . . It would have to be another type of case where I could possibly consider it." When the court inquired, "But that would not be a case where the charge is murder with the special circumstance that I have described here?," Prospective Juror H. L. replied, "Yes."

Defense counsel asked Prospective Juror H. L., "In your mind if it was this type of case very generally, this special circumstance being an intentional killing during the course of a robbery and there were very severe aggravating factors that shocked you . . . that you found were so abhorrent and fit into that circumstance, you could consider and be open to both penalties?" Prospective Juror H. L. responded, "I still would not consider the death penalty. That is not the circumstances I'm talking about . . . More like a mass murder or like crimes against humanity or political crimes." The court then inquired, "What kinds of crimes?" Prospective Juror H. L. replied, "Like the Eichmann type murders." Defense counsel inquired, "So am I correct in understanding you that in this type of factual situation of a potential killing during the course of a robbery that you would not be open to both penalties under any circumstances?" Prospective Juror H. L. responded, "Under any circumstances, yes." The prosecutor challenged Prospective Juror H. L. for cause under *Witt, supra,* 469 U.S. 412, and defense counsel responded, "submitted." The court sustained the challenge.

### b. *Analysis*

■ "The applicable law is settled. The trial court may excuse for cause a prospective juror whose views on the death penalty would prevent or substantially impair the performance of that juror's duties" in accordance with the court's instructions and the juror's oath. (*People v. Smith* (2003) 30 Cal.4th 581, 601 [134 Cal.Rptr.2d 1, 68 P.3d 302] (*Smith*); see *Witt, supra,* 469 U.S. at p. 424 [setting forth that standard as the applicable federal standard].) "The standard of review of the court's ruling regarding the

prospective juror's views on the death penalty is essentially the same as the standard regarding other claims of bias. If the prospective juror's statements are conflicting or equivocal, the court's determination of the actual state of mind is binding. If the statements are consistent, the court's ruling will be upheld if supported by substantial evidence." (*People v. Horning* (2004) 34 Cal.4th 871, 896–897 [22 Cal.Rptr.3d 305, 102 P.3d 228].)

■ Here, with regard to the excusal of Prospective Jurors M. M., M. W., and H. L., defendant merely submitted the question to the trial court. Hence, as a practical matter, he "did not object to the court's excusing the juror, but . . . also refused to stipulate to it." (*People v. Cleveland* (2004) 32 Cal.4th 704, 734 [11 Cal.Rptr.3d 236, 86 P.3d 302].) Although "this failure to object does not forfeit the right to raise the issue on appeal, . . . it does suggest counsel concurred in the assessment that the juror was excusable." (*Id.* at pp. 734–735; see *Witt, supra,* 469 U.S. at pp. 434–435 [in light of counsel's failure to question the prospective juror or object to her excusal for cause, "it seems that . . . no one in the courtroom questioned the fact that her beliefs prevented her from sitting"].)

■ Moreover, with respect to all four of the prospective jurors in question, substantial evidence supports the trial court's finding that, based upon their demeanor and responses, the views of these prospective jurors would prevent or substantially impair the performance of their duties. All four prospective jurors indicated at various points during their voir dire that, in light of their views concerning the death penalty and the normative role assigned to the jury under California's death penalty law, they were unable to state that they could consider imposing the death penalty in this case as a reasonable possibility. Thus, Prospective Juror R. V. repeatedly indicated that although his views regarding the death penalty would not affect his ability to make a finding of fact, those views would affect his ability to make "a moral judgment that says the moral character of this person is such that this person deserves to be executed." Prospective Jurors M. M., M. W., and H. L. all indicated that they could not state that they would be able to consider imposing the death penalty, either in any case or in the kind of case at issue here. Under these circumstances, the trial court properly could find that each juror's views regarding the death penalty would prevent or substantially impair the performance of his or her duties. (See, e.g., *People v. Ashmus* (1991) 54 Cal.3d 932, 963 [2 Cal.Rptr.2d 112, 820 P.2d 214] [a prospective juror must be able to do more than simply consider imposing the death penalty at the penalty phase; he or she "must be able to . . . consider imposing the death penalty *as a reasonable possibility* " ].)

■ Defendant acknowledges that numerous decisions of this court have held that when a prospective juror's statements are conflicting or equivocal,

the trial court's determination as to the juror's actual state of mind is entitled to deference. (See, e.g., *People v. Horning, supra,* 34 Cal.4th at p. 896; *People v. Mincey* (1992) 2 Cal.4th 408, 456–457 [6 Cal.Rptr.2d 822, 827 P.2d 388]; *People v. Frierson* (1991) 53 Cal.3d 730, 742–743 [280 Cal.Rptr. 440, 808 P.2d 1197].) Defendant contends, however, that this long and well-established line of authority is inconsistent with the United States Supreme Court decisions in *Gray, supra,* 481 U.S. 648, and *Adams v. Texas* (1980) 448 U.S. 38 [65 L.Ed.2d 581, 100 S.Ct. 2521] (*Adams*), and should be overruled. Relying in substantial part upon the transcripts of the jury voir dire and the arguments advanced in the briefs that were filed in *Gray* and *Adams,* defendant contends that those cases "made clear that when a prospective capital case juror gives equivocal responses, the state has not carried its burden of proving that the juror's views would 'prevent or substantially impair the performance of his duties as a juror.' " On this basis, defendant contends that the trial court improperly excused the four prospective jurors.

██ We reject defendant's contention. In its decision in *Witt, supra,* 469 U.S. 412—decided several years after *Adams*—the high court clearly explained that despite "lack of clarity in the printed record . . . there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. . . . [T]his is why deference must be paid to the trial judge who sees and hears the juror." (*Witt, supra,* 469 U.S. at pp. 425–426; see *id.* at p. 428 [a trial court's finding concerning a prospective juror's state of mind "is based upon determinations of demeanor and credibility that are peculiarly within a trial court's province. Such determinations [are] entitled to deference . . . on direct review . . . ." (Fn. omitted.)].) Nothing in the high court's subsequent decision in *Gray, supra,* 481 U.S. 648, purports to depart from or alter *Witt's* holding with regard to the deference that properly must be accorded to a trial court's finding concerning a prospective juror's state of mind; indeed, the issue before the court in *Gray* did not involve the determination of the correct standard for excusing a prospective juror under *Witt* at all, but rather the standard of prejudice that applies when a prospective juror improperly has been excused for cause under *Witt.* (*Gray, supra,* 481 U.S. at pp. 659–668.) Accordingly, there is no basis for reconsidering this court's uniform line of decisions on this point.

In sum, we conclude that the trial court did not err under the applicable federal constitutional standard in excluding the four prospective jurors for cause.

### 2. *Asserted* Caldwell *error*

Defendant contends that because the prosecutor told a "fully qualified juror that a death sentence was only a 'recommendation' that defendant be

executed in the future, and the trial court was forced to discharge this prospective juror as a consequence, reversal is required."

During the *Hovey* voir dire of Prospective Juror S. W., the prosecutor made the following remark: "If the aggravating factors are substantially heavy in your mind in an ethical and moral value then you may impose the death penalty and it's a vote, it's a recommendation to the court the defendant should be executed at some time in the future." The prosecutor then questioned Prospective Juror S. W. about her occupation. Several days later during the jury selection, defendant moved that the court excuse Prospective Juror S. W. Relying upon *Caldwell v. Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633] (*Caldwell*), defense counsel expressed concern that the prosecutor's comment might cause Prospective Juror S. W., were she selected as a juror, to inform other jurors, "Well, it's all right, we can vote for a certain penalty because it's subject to the court's review, if we made a mistake it can be taken care of." Defense counsel noted that "since this is the only juror such a remark has been made to, . . . I would ask the court to excuse the juror," and requested that the court "admonish the district attorney not to make a comment like that in the future, either in jury selection or in the final argument." After affording the prosecutor an opportunity to review and present relevant authority, the trial court took the matter under submission and ultimately excused Prospective Juror S. W. for cause.

Defendant contends that the prosecutor violated *Caldwell* by making the comment in question, and that "[b]ased on this *Caldwell* violation, the trial court was forced to discharge [Prospective Juror S. W.] from serving on the jury. . . . [B]ecause the prosecutor's *Caldwell* violation resulted in the exclusion of an otherwise fully qualified juror, reversal is required," and it is unnecessary to analyze whether the error caused prejudice.

In raising this issue, defendant cites *Witt, supra*, 469 U.S. 412, and *Witherspoon v. Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770] (*Witherspoon*), as well as *Caldwell. Witherspoon* and *Witt* address the issue of potential juror bias regarding the death penalty, as does *Caldwell*, but the decisions differ in certain critical respects. Error arising under *Witherspoon* and *Witt* is "rooted in the constitutional right to an impartial jury" under the Sixth Amendment, and is reversible per se. (*Gray, supra*, 481 U.S. at p. 668.) The excusal of prospective jurors who *improperly* are determined to be biased against the death penalty may lead to a jury " 'uncommonly willing to condemn a man to die.' " (*Adams, supra*, 448 U.S. at pp. 43–44; see *Gray, supra*, 481 U.S. at p. 666.)

By contrast, *Caldwell* error is based upon the Eighth Amendment, and focuses on the reliability of the death penalty verdict "as well as bias in favor

of death sentences" when a jury improperly is told that responsibility for the penalty verdict lies elsewhere. (*Caldwell, supra*, 472 U.S. at p. 330; see *id.* at p. 333 [the risk that an invitation to the jury to rely upon appellate review "will generate a bias toward returning a death sentence is simply too great"]; *Sawyer v. Smith* (1990) 497 U.S. 227, 244 [111 L.Ed.2d 193, 110 S.Ct. 2822] ["our concern in *Caldwell* was with the 'unacceptable risk' that misleading remarks could affect the reliability of the sentence"].) *Caldwell* error creates "the danger of a defendant's being executed in the absence of any determination that death was the appropriate punishment." (*Caldwell, supra*, 472 U.S. at p. 332.) Thus, unlike *Witherspoon* and *Witt*, *Caldwell* does not address error involving jurors who *improperly* are determined to be biased regarding the death penalty and then are excused; rather *Caldwell* requires that a reviewing court determine whether the jury *was biased* toward the death penalty because of "state-induced suggestions that the sentencing jury may shift its sense of responsibility." (472 U.S. at p. 330.)

In the present case, the prospective juror to whom the prosecutor's questioned comment was made never was impaneled, but was excused at the request of defendant. That circumstance precludes any claim on appeal that a juror biased in favor of the death penalty participated in determining the punishment imposed upon defendant, or that the penalty verdict was rendered unreliable because of the prosecutor's comment during sequestered voir dire. (See *Smith, supra*, 30 Cal.4th at pp. 602–603 [the defendant did not suffer any prejudice from prosecutor's comment on voir dire allegedly undermining the seriousness of a death penalty verdict, because the prospective juror did not sit on the jury].) The circumstance that the prosecutor's action prompted defendant's motion to excuse the prospective juror does not alter that conclusion.

Moreover, defendant is not free to contend on appeal that the trial court erred in granting his motion to excuse the prospective juror for cause. It is clear that other measures short of excusal—for example, subsequent clarifying instruction by the trial court—were available to remedy any misunderstanding arising from the prosecutor's single comment made during sequestered voir dire. Comments that might lead to *Caldwell* error are capable of subsequent correction, and a reviewing court may consider other prosecutorial argument or the trial court's instructions in determining whether any *Caldwell* claim is valid. (*Caldwell, supra*, 472 U.S. at p. 333 ["the *uncorrected* suggestion that the responsibility for any ultimate determination of death will rest with others presents an intolerable danger that the jury will in fact choose to minimize the importance of its role" (italics added)]; *id.* at p. 339 [the "trial judge in this case not only failed to correct the prosecutor's remarks, but in fact openly agreed with them"].) In the present case, defendant did not seek corrective action other than the excusal granted by the trial court. No basis for reversal appears.

### 3. *Asserted* Wheeler *error*

Defendant contends that reversible error arose under the Sixth and Fourteenth Amendments because the prosecutor's stated reasons for exercising peremptory challenges against Jewish prospective jurors were mere pretexts, and that the trial court applied an incorrect standard in ruling on defendant's *Wheeler* motion.

■ In *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*) we held " 'that the use of peremptory challenges by a prosecutor to strike prospective jurors on the basis of group membership violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16, of the California Constitution. Subsequently, in *Batson* v. *Kentucky* (1986) 476 U.S. 79, 84–89 [90 L.Ed.2d 69, 106 S.Ct. 1712] [(*Batson*)] . . . the United States Supreme Court held that such a practice violates . . . the defendant's right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution.' " (*People v. Catlin* (2001) 26 Cal.4th 81, 116 [109 Cal.Rptr.2d 31, 26 P.3d 357].) Religious groups are cognizable under *Wheeler*. (See, e.g., *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1122 [124 Cal.Rptr.2d 373, 52 P.3d 572]; *Wheeler, supra*, 22 Cal.3d at p. 276.) The United States Supreme Court has not similarly extended *Batson*, although some state and federal courts have done so. (See *Miller-El v. Dretke* (2005) 545 U.S. 231 [162 L.Ed.2d 196, 125 S.Ct. 2317, 2342] (conc. opn. of Breyer, J.) [noting "[s]ome lower courts have extended *Batson*'s rule to religious affiliation as well"].)[5] Assuming without deciding that *Batson*, like *Wheeler*, applies to peremptory challenges based upon bias against religious groups, we nevertheless conclude that defendant has failed to demonstrate purposeful discrimination against Jewish prospective jurors. (See *Purkett v. Elem* (1995) 514 U.S. 765, 768 [131 L.Ed.2d 834, 115 S.Ct. 1769] ["the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike"]; *Batson, supra*, 476 U.S. at p. 93 [the burden is "on the defendant who alleges discriminatory selection of the venire 'to prove the existence of purposeful discrimination' "].)

---

[5] Defendant's claim rests upon an assertion of discrimination on the basis of religion, so we need not explore the extent to which a Jewish background may constitute a racial or ethnic classification for the purposes of an equal protection analysis under *Batson, supra*, 476 U.S. 79. (See *Shaare Tilfila Congregation v. Cobb* (1987) 481 U.S. 615, 617–618 [95 L.Ed.2d 594, 107 S.Ct. 2019] [construing 42 U.S.C. § 1982 to permit a Jew to state a claim of racial discrimination because, at the time of its enactment, Jews were "among the peoples then considered to be [a] distinct" race]; see also *Saint Francis College v. Al-Khazraji* (1987) 481 U.S. 604 [95 L.Ed.2d 582, 107 S.Ct. 2022] [holding that Arab ancestry constitutes a racial classification within the meaning of 42 U.S.C. § 1981].)

The high court recently restated the *Batson* standard as follows: "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citations.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.]" (*Johnson v. California* (2005) 545 U.S. 162 [162 L.Ed.2d 129, 125 S.Ct. 2410, 2416], fn. omitted (*Johnson*).) Third, once the prosecutor produces a neutral explanation for the challenges, the trial court must evaluate the " 'persuasiveness of the justification' " and " 'determine[] whether the opponent of the strike has carried his burden of proving purposeful discrimination.' [Citation.]" (*Id.* at p. 171 [125 S.Ct. at p. 2418].)

In *Johnson*, the high court also concluded that an element of the *Wheeler* standard for determining whether a prima facie case was established is inconsistent with that the standard announced in *Batson*. (*Johnson, supra*, 545 U.S. at p. 168 [125 S.Ct. at p. 2416].) In the present case, the trial court elicited the prosecutor's reasons for the peremptory challenges, and thus the issue whether defendant established a prima facie case is moot. (*Hernandez v. New York* (1991) 500 U.S. 352, 359 [114 L.Ed.2d 395, 111 S.Ct. 1859] (*Hernandez*); *People v. Welch* (1999) 20 Cal.4th 701, 745–746 [85 Cal.Rptr.2d 203, 976 P.2d 754] (*Welch*).) We proceed to the third step of the *Batson* analysis and, specifically, to defendant's claim that the prosecutor's justifications were pretextual.

a. *Asserted pretextual justifications for excusal*

Defendant asserts that the prosecutor's stated reasons for excusing Prospective Jurors D. H. and M. B. were not supported by the record but instead were pretextual.

On May 10, 1989, and July 5, 1989, Prospective Jurors D. H. and M. B. were examined, respectively, on voir dire. In response to defense counsel's questioning, Prospective Juror D. H. stated that he was "raised Jewish" and continued to participate in certain ceremonies of that religion. Also in response to questioning by defense counsel, Prospective Juror M. B. stated that he had attended the Hebrew University of Jerusalem for four months, that he practiced "certain things to do with Judaism," and that religion was "personally very important."

On September 11, 1989, these and all other qualified prospective jurors returned to the court for the exercise of peremptory challenges. At this time, Prospective Juror D. H. was questioned during sequestered voir dire regarding a letter he had written to the court regarding his aversion to cigarette

smoke.[6] Immediately following this voir dire, the prosecutor exercised a peremptory challenge against Prospective Juror D. H. Subsequently, the prosecutor challenged Prospective Juror M. B. After the latter peremptory challenge, defendant brought a *Wheeler* motion, alleging that the prosecutor "has used his challenges to strike most of the members of" the group of Jewish prospective jurors. Defendant also cited *Batson, supra,* 476 U.S. 79.[7]

The prosecutor noted that both Prospective Jurors D. H. and M. B. had given "terrible" answers when they were examined "some months ago. I made my decisions long ago. . . . I didn't even realize they were Jewish until [defense counsel] mentioned it this morning." The trial court subsequently noted that the prosecutor had mentioned his reasons for excusing these prospective jurors and asked him to state the reasons again. The prosecutor responded that: "In my estimation neither of them would ever impose the death penalty against" defendant. The trial court stated, "All right. I'd like you to be a bit more specific to them individually," and requested that the prosecutor review his notes during the noon recess.

At the afternoon hearing on the motion, the prosecutor noted that Prospective Juror D. H. had written a letter to the trial court stating that he was allergic to cigarette smoke and did not want to be in a place where persons smoked. The prosecutor "felt that because of that he might not be able to get along with others." The prosecutor, citing the record of voir dire in May 1989, added that Prospective Juror D. H. had stated that it was possible he had feelings that would prevent him from voting to execute a person. The prosecutor explained that the "overriding statement" by Prospective Juror D. H. that led to the peremptory challenge was that this juror might consider it a mitigating circumstance if a suspect committed a crime, was cornered by a police officer, and then shot the police officer.

Again referring to the record of voir dire, the prosecutor stated that Prospective Juror M. B. appeared to have difficulty understanding the weighing of aggravating and mitigating circumstances and the relationship between a special circumstance and the penalty. As the prosecutor pointed out, that prospective juror also "felt that the death penalty should be limited [to] heinous crimes," such as those committed by Charles Manson or Richard

---

[6] Prospective Juror D. H.'s letter dated May 24, 1989, stated in relevant part: "I am allergic and averse to cigarette smoke. I have asthma and have developed a wheezing cough after indoor exposure to cigarette smoke. I work in the field of air pollution and public health, and am mindful of other potential health hazards of passive exposure to such smoke. I feel that exposure to cigarette smoke would make me uncomfortable, impatient, and unable to function at full capacity as a juror. I hope you might consider excusing me from the jury if smoking will be permitted indoors during the trial or deliberations."

[7] The defense asserted that an additional prospective juror, whose name was mentioned at the time the peremptory challenges were exercised, was Jewish.

Ramirez. Prospective Juror M. B. stated he believed he could not impose the death penalty for crimes "lesser" than those committed by Manson and Ramirez, but then said he thought he could. The prosecutor also pointed to the prospective juror's statement that a "past history of violence may weigh more heavily with respect to aggravating factors and mitigating circumstances." The prosecutor noted that because "defendant doesn't have a terribly heavy history of violence, I felt that Mr. [M. B.] would not be a good juror for me." Prospective Juror M. B. also had indicated that an attempted home robbery he had experienced had not had a profound impact on him. The prosecutor stated: "So I felt with Mr. [M. B.'s] attitude that he would not be a proper juror," and "in neither of these gentleman's cases did I consider their religion at all." The prosecutor stated that he had made his "decisions on both of these guys the same day they were here as I did with everybody else."

The trial court considered defendant's motion in light of the prosecutor's explanations and found defendant had failed to persuade the court that the challenges were motivated by bias "alone."

Contrary to defendant's claim, we conclude the record does not establish that the prosecutor's justifications were pretextual. Although the prosecutor stated he did not realize these prospective jurors were Jewish until defense counsel mentioned this, despite the circumstance the record of the voir dire reflects that both prospective jurors briefly discussed their affiliation with Judaism, the relevant voir dire examination of these prospective jurors had taken place a number of months prior to the occasion on which the prosecutor exercised the peremptory challenges, and the prosecutor had not reviewed the transcripts of the voir dire when he initially made the challenges.

The prosecutor also explained he had decided to excuse Prospective Juror D. H. on the same day the prospective juror was questioned on voir dire—May 10, 1989. As defendant observes, however, the prosecutor also specified that he relied upon the letter Prospective Juror D. H. wrote to the court requesting that he be excused if indoor cigarette smoking would be allowed—dated May 24, 1989. Considered in context, the prosecutor's comments indicate that his decision on May 10 to excuse Prospective Juror D. H. was reinforced by the subsequent discovery that the prospective juror had written to the court. The prosecutor exercised his challenge against Prospective Juror D. H. soon after the revelation of the letter's existence. Regarding defendant's current challenge to the accuracy of the prosecutor's conclusions that the letter indicated D. H. might experience difficulty getting along with others, we note that the latter specifically stated cigarette smoke would render the prospective juror "impatient and unable to function."

The prosecutor's other stated reasons for excusing Prospective Jurors D. H. and M. B.—namely, the prosecutor's perception that the prospective jurors'

views concerning imposition of the death penalty in certain circumstances were unfavorable to the prosecution and that Prospective Juror M. B. experienced difficulty understanding certain critical aspects of the law—are supported by the record of the prospective jurors' statements during the voir dire. None of the proffered justifications appear to have been pretextual. Although, on appeal, defendant emphasizes other statements by these prospective jurors that might have provided a prosecutor with a rationale for their retention as jurors, the question before the trial court was whether the prosecutor's stated reasons were supported by the record and whether the court was persuaded they were not pretextual. In denying the *Wheeler* motion, the trial court did not rely upon its memory of the voir dire occurring months earlier, but noted, rather, that it had "review[ed] the transcripts with regard to both of these jurors," presumably to make certain that the prosecutor's stated reasons were supported by the record.

Defendant further contends that the pretextual nature of the prosecutor's excusal of these prospective jurors is demonstrated by a comparison of the voir dire answers of Prospective Jurors D. H. and M. B. with those of several nonchallenged and seated jurors. Defendant did not engage in a comparative juror analysis in the trial court. We disapproved of performing for the first time on appeal such a comparative analysis in *People v. Johnson* (1989) 47 Cal.3d 1194, 1221 [255 Cal.Rptr. 569, 767 P.2d 1047]. Even assuming without deciding that this aspect of *People v. Johnson* has been called into question by the decision in *Miller-El v. Dretke, supra,* 545 U.S. 241 [125 S.Ct. 2317], we conclude that the comparative juror analysis relied upon by defendant fails to demonstrate purposeful discrimination.

In *Miller-El v. Dretke, supra,* 545 U.S. 239 [125 S.Ct. 2317], in the context of a challenge based upon racial bias, the high court observed that if a prosecutor's explanation for a challenged strike "applies just as well to an otherwise-similar nonblack [juror] who is permitted to serve, that is evidence tending to prove purposeful discrimination . . . ." (*Id.* at p. 239 [125 S.Ct. at p. 2325].) As noted, *ante,* the prosecutor remarked that the "overriding statement" made by Prospective Juror D. H. that led to the peremptory challenge was D. H.'s observation that the juror might consider it a mitigating circumstance if a suspect who committed a crime was cornered by a police officer and shot the police officer. In addition, Prospective Juror D. H. had corresponded with the court regarding his aversion to cigarette smoke and desire to avoid locations in which persons might smoke, giving rise to questions whether the prospective juror could "get along with others." Finally, the prospective juror revealed the possibility his feelings would prevent him from executing someone.

Defendant does not refer us to, and we have not discovered, any comment by a seated juror that was similar to D. H.'s comment that, following a crime,

a perpetrator's stressful confrontation preceding the shooting of a police officer would constitute mitigating evidence. Defendant does not point to any other occasion in which a seated juror communicated with the court to identify behavior of others rendering jury experience so unpleasant as to justify a request to be excused from service. Although defendant correctly observes that Jurors R. F. and G. R. gave responses bearing some similarity to those of Prospective Juror D. H. concerning their feelings about the death penalty,[8] these two jurors were not "otherwise [] similar" to Prospective Juror D. H. in any other respect contributing to the prosecutor's challenge. The circumstance that the two jurors made a single comment having similarity does not establish that the prosecutor's reasons were pretextual or that defendant established purposeful discrimination under the facts of the present case.

We further conclude that a comparison of Prospective Juror M. B. to seated Jurors E. E., P. L., R. F., M. T., C. V., G. R., and D. St. and Alternate Juror J. C. does not demonstrate that these jurors were substantially similar, nor that the prosecution's stated justifications for his peremptory challenge were therefore pretextual.

 For example, the prosecutor justified his challenge of Prospective Juror M. B. in part based upon the juror's statement that his experience with an attempted home robbery (which occurred while the prospective juror was at home) had not had a profound impact on him. Defendant does not refer us to, nor have we found, any similar comment made by any seated juror. Indeed, because the special circumstance alleged in this case was murder in the course of a robbery committed in a motor home, it is understandable that a prosecutor would challenge a juror who was not deeply affected by an attempted robbery in his own home. (See *Miller-El v. Dretke, supra,* 545 U.S. at p. 247 [125 S.Ct. at p. 2329] [noting the court's prior decisions holding that the credibility of the prosecutor's justifications "can be measured by 'how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy' "].)

In addition, the prosecutor stated he had excused Prospective Juror M. B. because the juror had remarked that a "past history of violence may weigh

---

[8] The record reflects that Prospective Juror D. H. responded, "That's possible," when asked "if he had any feelings about the death penalty that would prevent [him] from voting to execute another human being . . . ." Upon further questioning, he clarified that he "would consider the circumstances of the particular case." Similarly, Juror R. F. stated that he had "some reservations about taking people's lives obviously" and that he might or might not consider the death penalty in a case involving robbery and intentional murder. Juror G. R. responded, "I believe I could, your honor," when asked whether he could make a choice between the two possible penalties. Upon questioning by the prosecutor, he subsequently clarified that "I believe it means yes, I can."

more heavily with respect to aggravating factors and mitigating circumstances." The prosecutor noted that defendant "doesn't have a terribly heavy history of violence." By contrast, none of the seated jurors referred to by defendant stated that a history of violence might weigh more heavily than other aggravating circumstances. Juror C. V. simply responded, "Yeah," when defense counsel, during a colloquy about the various factors that might be important in determining the appropriate penalty, inquired whether "it [would] make any difference to you if the defendant had never done a serious crime of violence before? Would that be important to you in deciding [the appropriate penalty]?" Similarly, Alternate Juror J. C. was asked by defense counsel, "We can also present to you whether this is the first and only incident of violence in his life. [Is] [t]he past history . . . with regards to other crimes or other history of violence something that you would seriously consider?" She responded, "Yes." She had previously been asked about the importance of premeditation, defendant's childhood and family history, and defendant's job accomplishments, and following a subsequent inquiry as to whether a history of drug problems would be important stated, "I feel they're all important, yes." Juror G. R. was asked by defense counsel "[W]ould it be important to you that there [were] no other instances of violence in the person's background before the factors alleged here?" Juror G. R. responded, "Yes." Defense counsel asked, "So background facts about the defendant would be important in determining the penalty in addition to the facts about the crime?" Juror G. R. stated, "What would be presented, yes." Finally, Juror D. St. responded "Sure," when asked by defense counsel whether she "might be interested if it got to the penalty phase in knowing more about the life of the defendant?" Defense counsel then inquired, "Apart from the crime . . . ?" Juror D. St. said, "Yes. . . . Habitual criminal, people who have done the same crime over and over again." Defense counsel asked a question the juror did not understand, and then inquired, "You might find it important to know whether there was an absence of violence in the person's past?" "Sure. Right." "Or whether they had a record of violence?" "Right."

Moreover, Prospective Juror M. B. expressed confusion as to the role played by a special circumstance in the penalty process and as to the weighing of aggravating and mitigating circumstances. By contrast, Juror E. E., whom defendant compares to Prospective Juror M. B., stated he would not want to know about defendant's past, but "[o]nly what is said here." Once it was explained that he would hear evidence and, implicitly, could consider defendant's past, Juror E. E. said he would "want to know a little about his past." Contrary to defendant's assertion, Juror P. L. was not "initially confused about the weighing process." Rather, when the prosecutor asked, "Do you feel as though you as a human being could ever vote to execute another human being," Juror P. L. said, "Could I do it personally?" The court explained that the prosecutor meant "[a]s a member of the jury," and Juror P. L.

replied, "Oh, I thought you meant just as an individual could I do this." The prosecutor said, "No, as a juror, not as the executioner but as a juror." Juror P. L. said "Yes." Nor did Juror R. F. appear to have difficulty understanding the weighing process, but rather appeared to indicate he personally would need "overwhelming evidence" to reach a death verdict. Juror M. T. initially may have had difficulty understanding the weighing process, but she clearly understood the prosecutor's explanation, as is demonstrated by the portion of the voir dire upon which defendant relies. In any event, defendant does not assert that Juror M. T. was similar to Prospective Juror M. B. on any of the other three bases upon which the prosecutor relied. We do not believe the single similarity demonstrates the prosecutor gave pretextual justifications for his challenge. Defendant is correct that somewhat similarly to Prospective Juror M. B., both Juror R. F. and Alternate Juror J. C. stated that they believed the death penalty was appropriate for "heinous" crimes. They were not, however, similar to Prospective Juror M. B. on any other basis. Again, this one similarity does not demonstrate that pretextual reasons were given.

In sum, the record supports the prosecutor's stated reasons, and a comparison of the two challenged prospective jurors with the seated jurors does not demonstrate such a degree of similarity as to establish the existence of pretext.

We further note that a prospective juror's religious affiliation, if it is not stated on a jury questionnaire or revealed during voir dire, is not ascertained as readily as is his or her race or gender. (See *Davis v. Minnesota* (1994) 511 U.S. 1115 [128 L.Ed.2d 679, 114 S.Ct. 2120] (conc. opn. of Ginsburg, J.) [denial of petn. for cert., noting the Minnesota high court's observation that religious affiliation " 'is not as self-evident as race or gender' " and that ordinarily " 'inquiry . . . into a juror's religious affiliation and beliefs is irrelevant and prejudicial' "].) In the present case, the record does not reflect that the prosecutor consistently examined prospective jurors to ascertain whether they were Jewish. (See *Batson*, *supra*, 476 U.S. at p. 97 ["the prosecutor's questions and statements during *voir dire* examination" may "refute an inference of discriminatory purpose"].) Rather, Prospective Jurors D. H. and M. B. both discussed their affiliation with Judaism in response to defense questioning. Indeed, on his jury questionnaire, Prospective Juror M. B. stated that he was not a member of any "religious" organization, although he did note elsewhere that he had lived in Israel for nearly a year. Likewise, Prospective Juror D. H., who completed a different version of the jury questionnaire, stated he belonged to no "societies, unions, professional associations, civic clubs, or other organizations" that could be characterized as religious.

Because religious affiliation may not emerge in the absence of specific questioning, there may have been additional persons of the Jewish faith who served on defendant's jury—notwithstanding the many juror questionnaires from which it appeared prospective jurors lacked religious affiliation. For example, Jurors G. R., P. L., and D. St. and Alternate Jurors R. B. and J. C. either responded in the negative when asked on the jury questionnaire whether they belonged to any "religious" or other organizations, or listed organizations that could not reasonably be characterized as religious. Using a different form of the questionnaire, Jurors M. T., C. V., T. F., E. E., R. F., D. St., and K. M. and Alternate Jurors M. S. and D. L. also stated that they belonged to no "societies, unions, professional associations, civic clubs, or other organizations" that reasonably could be characterized as religious.[9] Yet on voir dire, Juror E. E. nevertheless identified himself as a "born Catholic" and "now a born again Christian"; Juror P. L. identified herself as a Baptist who attended church; Juror D. St. had a Lutheran background; and Juror M. T. stated she was Catholic and went to church every Sunday. Further, the religious affiliation of seven jurors (Jurors G. R., C. V., D. N., D. St., T. F., R. F., and K. M.), or greater than one-half the number of jurors, and all four alternate jurors (Alternates J. C., D. L., M. S., and R. B.), never was elicited or otherwise identified.[10]

Thus, it is virtually impossible on this record to state the number of Jewish persons who served on the jury, or who were in the jury pool. (Cf. *Miller-El v. Dretke, supra,* 545 U.S. at p. 240 [125 S.Ct. at p. 2325] [noting the prosecution challenged 10 out of 11 African-American prospective jurors not removed for cause].) As observed, *ante,* even when jurors did not list religious organizations on their questionnaires, on several occasions voir dire revealed that they were in fact religious. Thus, although the prosecutor exercised peremptory challenges against two prospective jurors who, during voir dire, identified affiliations with Judaism in response to questioning by defense counsel, the circumstance that neither the prosecutor nor defense counsel ever inquired into the religious affiliation of the majority of the seated jurors and alternates, and that the prosecutor had no other reasonable means of ascertaining their religious affiliation, undercuts any suggestion of purposeful discrimination against Prospective Jurors D. H. and M. B. because of their Jewish faith.

---

[9] Juror D. N.'s jury questionnaire is not in the record.

[10] Alternate Juror J. C. responded "No" when asked by defense counsel whether her "feelings about the death penalty [are] any result of your religious feelings." Juror C. V. was asked by defense counsel, "So there is nothing in your philosophy or religious background or your feelings about your own personal participating [*sic*] that would prevent you from applying either penalty, is that correct?" Juror C. V. replied, "That's correct." Juror K. M. was asked by defense counsel, "And how does religion play any part in your life? Is religion important?" Juror K. M. replied, "No."

 Finally, as we do in any case of alleged bias, we defer to the trial court's determination as to credibility. (*Hernandez, supra,* 500 U.S. at p. 365 [best evidence of whether race-neutral explanation should be believed is often "the demeanor of the attorney who exercises the challenge," and "evaluation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province' "]; *Batson, supra,* 476 U.S. at p. 98, fn. 21 ["Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference"].)

We therefore conclude, with respect to both Prospective Jurors M. B. and D. H., that defendant has not demonstrated that the prosecutor engaged in purposeful discrimination against prospective Jewish jurors, and that the defense motion below was properly denied by the trial court.

### b. *Asserted incorrect standard*

Defendant contends that the trial court applied an incorrect standard to decide the *Wheeler* motion. He asserts that the trial court determined that group bias played a part in the prosecutor's peremptory challenges, but nonetheless denied defendant's *Wheeler* motion because group bias was not the "sole" reason motivating the prosecutor. In advancing this argument, defendant relies upon the circumstance that the trial court, in rejecting defendant's *Wheeler* motion, stated: "Now after an analysis of the proffered reasons with regard to the exercise of these two peremptory challenges, the court will find at this time that the peremptory challenges in question were not predicated on group bias alone and accordingly the motion will be denied."

 In *Wheeler,* this court stated that "the use of peremptory challenges to remove prospective jurors on the *sole* ground of group bias violates the right to trial by a jury drawn from a representative cross-section of the community under article I, section 16, of the California Constitution." (*Wheeler, supra,* 22 Cal.3d at pp. 276–277, italics added; see *id.* at p. 281 ["If the court finds that a prima facie case has been made, the burden shifts to the other party to show if he can that the peremptory challenges in question were not predicated on group bias alone" (fn. omitted)]; *id.* at p. 287 ["all claims in California courts that peremptory challenges are being used to strike jurors solely on the ground of group bias are to be governed by article I, section 16, of the California Constitution and the procedure outlined above"]; see also *Batson, supra,* 476 U.S. at p. 89 ["the Equal Protection Clause forbids the prosecutor to challenge potential jurors *solely* on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant" (italics added)]; see also

*People v. Willis* (2002) 27 Cal.4th 811, 816 [118 Cal.Rptr.2d 301, 43 P.3d 130]; *People v. Ayala* (2000) 24 Cal.4th 243, 260 [99 Cal.Rptr.2d 532, 6 P.3d 193]; *People v. Turner* (1994) 8 Cal.4th 137, 164 [32 Cal.Rptr.2d 762, 878 P.2d 521] *(Turner)*.) In light of the language in *Wheeler*, it is not surprising that the trial court repeated this wording in ruling on defendant's *Wheeler* motion. (See *People v. Reynoso* (2003) 31 Cal.4th 903, 927, fn. 8 [3 Cal.Rptr.3d 769, 74 P.3d 852] [because this court has employed the phrase " 'systematic exclusion,' " "it hardly seems fair or appropriate to fault this trial judge for using the term . . . much less to conclude that a wrong standard was applied in ruling on the motion"].)

Relying upon a number of decisions of the United States Supreme Court that have arisen in other contexts, defendant contends that when a trial court finds that a prosecutor's exercise of a peremptory challenge is based in part on an impermissible class bias, the court may not properly deny a *Wheeler* or *Batson* objection on the ground that the improper motivation was not the "sole" or "only" motivation for the challenge. (Cf. *Arlington Heights v. Metropolitan Housing Development Corp.* (1977) 429 U.S. 252, 265 [50 L.Ed.2d 450, 97 S.Ct. 555] [in seeking to establish that zoning decision was motivated by racial bias in violation of the equal protection clause, challenger need not establish "that the challenged action rested solely on racially discriminatory purposes. Rarely can it be said that a legislature or administrative body . . . made a decision motivated by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one" (fn. omitted)]; *Price Waterhouse v. Hopkins* (1989) 490 U.S. 228, 241, 258 [104 L.Ed.2d 268, 109 S.Ct. 1775] [in action under tit. VII of the federal Civil Rights Act of 1964, plaintiff need not prove that unlawful discrimination was the sole factor motivating an employment decision in order to establish a violation of the act]; see also *Desert Palace, Inc. v. Costa* (2003) 539 U.S. 90, 101–102 [156 L.Ed.2d 84, 123 S.Ct. 2148] [considering use of circumstantial evidence as proof in mixed-motive case under 1991 amendments to tit. VII].) Defendant acknowledges that neither in *Wheeler* nor in any subsequent decision has our court actually addressed or decided the question whether a mixed-motive peremptory challenge could constitute a violation of the defendant's constitutional rights, but he maintains that the question must be decided in the present case.

We do not agree that we need to or properly should address the mixed-motive question in this case. For the reasons explained, *ante,* we have rejected defendant's claim that the prosecutor's stated reasons for the peremptory challenges were pretextual, and defendant points to no evidence in the record other than the mere circumstance that two Jewish prospective jurors were excused through peremptory challenges upon which the trial court could have found such group bias. Under these circumstances, we conclude it is not reasonable to interpret the trial court's use of the language from *Wheeler* in

denying defendant's motion as a determination by the trial court that the prosecutor was motivated in part by group bias. Rather, in light of the record in this case, we believe the trial court's statement simply reflected its finding that defendant had not established that the peremptory challenges in question were motivated by group bias.

B. *Guilt phase*

1. *Asserted erroneous limitation on scope of cross-examination*

Defendant contends the trial court committed reversible error, and violated his state and federal constitutional rights to confrontation, a fair trial, due process of law, and a reliable verdict, when it refused to allow him to cross-examine Jamie Gronley concerning promises made to her in exchange for her testimony.

During cross-examination, defense counsel asked Gronley whether a month earlier she had been convicted of the felony of possession of heroin. She replied "yes," and also responded affirmatively when asked whether she was awaiting sentencing on that conviction. Defense counsel then asked, "At the time you pled guilty to that offense . . . did the district attorney recommend you be released from custody?" "No, he did not." "Within 10 minutes of you entering that plea were you released from custody?" "I was released. That was my release date from Hayward was August 30th. That's the day I got out of jail. My sentencing date for this case that I picked up is on November 3rd." "Did your attorney represent to you that if you entered a guilty plea in this case the district attorney would recommend you be released from custody?" "There were no promises made." "Were you released [from] custody the very date you entered your plea?" "I was released on O.R. [own recognizance] and also upon my release date and I was put on O.R. for the new date." "And are you awaiting sentence at this time?" "Yes, I am." Defense counsel then asked, "Has your attorney indicated if your testimony is favorable in this case the district attorney—" The prosecutor objected, and Gronley stated, "Whether I had a case or not I would testify." The prosecutor stated that defense counsel was "asking [Gronley] to violate the lawyer-client privilege." The trial court sustained the objection "as to anything her attorney may have told her" and told defense counsel to proceed. Defense counsel then changed the subject, asking Gronley whether she had suffered a prior felony conviction in Oregon.

 Contrary to defendant's assertion, it is apparent defendant was not "completely precluded" from exploring the topic of what promises, if any, were made to Ms. Gronley in exchange for her testimony. Rather, defense counsel cross-examined Gronley at some length concerning the chain of

events leading to her impending sentencing in the felony case, apparently in an effort to delineate circumstances that implicitly might demonstrate that the prosecutor had accorded her leniency. As the high court has observed, "the Confrontation Clause only guarantees 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' " (*Pennsylvania v. Ritchie* (1987) 480 U.S. 39, 53 [94 L.Ed.2d 40, 107 S.Ct. 989].)

Defendant could have asked Gronley, but did not, whether any promises of leniency were made to her in exchange for her testimony in the present case, without inquiring as to her conversations with her attorney. Instead, defendant simply abandoned the subject. Under these circumstances, we are reluctant to find error of constitutional proportion based upon the trial court's ruling sustaining an objection to a single question regarding a witness's conversation with her attorney.[11]

In addition, on May 12, 1987, in the context of a broad discovery order entered prior to trial, the trial court ordered that the prosecutor disclose to defense counsel, with respect to all witnesses, the following: "any and all promises, inducements, offers of reward or immunity, or affirmative representations made or implied to such persons in an effort to obtain information or testimony as to the investigation and/or prosecution of the alleged offenses as charged in the information, and as to such persons, any and all threats made or implied for a like purpose." This order was to "be deemed a continuing and ongoing order through the completion of trial, so that any items granted by this order, which are actually or constructively obtained by or become known to the District Attorney of Alameda County or any of his deputies, investigators, employees, or agents after initial compliance with this order has been made, shall also be made available forthwith to defense counsel."

On September 11, 1989, the eve of opening statements to the jury, the prosecutor noted that "There's been a continuing discovery order. . . . [T]he court ordered me to continue to disclose any promise or representation I

---

[11] Defendant also claims the trial court "exacerbated the impact" of its asserted error (in preventing defense counsel from fully impeaching Gronley) by permitting Gronley to testify that the police did not find credible her confession to the murder of Germaine. As discussed, *ante*, however, the trial court did not err in sustaining the prosecutor's objection, and defendant thereafter failed to pursue the matter. Nor did Gronley's testimony regarding her confession constitute, as defendant contends, "lay opinion regarding the veracity of a witness." Rather, evidence that Gronley initially confessed to a murder she later ascribed to defendant was relevant to her credibility. Thus, the probative value of that confession also was relevant. Presumably, the reason the police did not find her confession credible was that she was unable to describe the victim and told the police that two bullets previously had penetrated the windshield of the motor home, a fact not corroborated by any witness who inspected the motor home on May 30.

made to any prospective witnesses." The prosecutor then stated that he had spoken with Jamie Gronley's attorney, Jack Noonan. Mr. Noonan stated that Gronley was in jail for probation violations and would be released on August 31; she had a court date on August 30 regarding a felony. The prosecutor informed the court that he had told Mr. Noonan: "Well, I don't object if she pleads guilty to the felony to have an out of custody [report and sentence] and I said other than that there are no promises as to her. So that was the representation made and it is my understanding that she did plead guilty to the felony or nolo, and that she is out of custody . . . [f]or purposes of report and sentence." The court asked defense counsel, "Mr. Meyer, anything further on that issue, sir?" Mr. Meyer responded, "That is the District Attorney's representation pursuant to the previous order and I have no further comments at this time."

There is no evidence in the record indicating that, subsequent to the colloquy described by the prosecutor, and despite the circumstance that the prosecutor was subject to the May 1987 discovery order until the "completion of trial," he made undisclosed promises to Gronley in exchange for her testimony. The prosecutor's pretrial disclosure suggests that defense counsel did not have any reason to pursue the topic with Gronley during cross-examination after the trial court sustained the prosecutor's objection.

Defendant further contends that the trial court erred by failing to hold a hearing to determine the admissibility of communications between Gronley and her attorney concerning the treatment she might expect in exchange for her favorable testimony. Defendant never sought a hearing on this issue, however, nor indeed did he even suggest the trial court erred in sustaining the objection. Defendant thus waived the claim on appeal. Even assuming the claim was not waived, it is clear that any error would have been harmless under any standard of review.

### 2. *Asserted improper admission of hearsay evidence*

Defendant contends that reversal is required because the trial court admitted unreliable hearsay evidence concerning the issue of identity, in violation of defendant's state and federal constitutional rights to confrontation of adverse witnesses, due process of law, and reliable guilt and penalty determinations.

During her direct testimony, Rebecca Germaine was asked whether her husband Lorin Germaine told her "anything that the buyer said to him?" Over defense objection, Rebecca responded that during the test drive, the prospective buyer had commented to Lorin that he "looked really familiar and he asked him if he had a younger brother, that [the prospective buyer] thought

that he knew [Lorin's] younger brother." Rebecca further testified that in fact, Lorin did have a younger brother, John, who looked "[e]xactly like him." Subsequently, Trede testified that Rebecca Germaine told him that Lorin had said the prospective buyer "thought he knew Lorin's brother." Trede further testified that in April 1986, defendant and Trede were in the same holding cell in municipal court. John Germaine was in the courtroom visiting Trede, and defendant made a comment about him to Trede.

On appeal, defendant challenges the admission of the testimony of Rebecca Germaine with regard to Lorin's recollection to her of the prospective buyer's comments, as well as Trede's testimony that Rebecca Germaine repeated to him the statement her husband Lorin assertedly made to her concerning the prospective buyer's conversation with Lorin. Defendant asserts that Rebecca's testimony describing Lorin's statements to her was double hearsay, and that Trede's testimony was triple hearsay, admitted in violation of the confrontation clause and serving "only to exacerbate the harm caused by introduction of the original hearsay."

A statement by defendant to Lorin constituted a statement by a party, and was relevant to the prospective buyer's identity. (See Evid. Code, § 1220; *People v. Robinson* (2000) 85 Cal.App.4th 434, 444–445 [102 Cal.Rptr.2d 179].) Nonetheless, that purported statement of the prospective buyer was recounted by the victim to Rebecca and subsequently to Trede. Assuming that the testimony of Rebecca and Trede presented multiple hearsay that should not have been admitted, there is no conceivable prejudice under any standard of review, because of the overwhelming evidence against defendant, including his admission to Gronley that he was the killer.

### 3. *Asserted illegal search and seizure*

Defendant contends that the police violated his United States Constitution, Fourth and Eighth Amendment rights by performing a warrantless search of belongings that he had stored in a private home, and by introducing in evidence a letter recovered in the search subsequently used to establish his identity as the killer.

The trial court held a hearing on defendant's motion to suppress evidence recovered in the search, in particular, as relevant here, defendant's letter to Gronley of May 9, 1986, indicating that defendant wanted to obtain "some wheels for us right away, prob[ably] a van." Hayward Police Detectives Muir and Muniz testified at the hearing on June 1, 1986, that following defendant's arrest and interview with the police, the officers went to the residence of Melba Valdez and Wanda Wilson, arriving at approximately 7:30 p.m. Valdez identified herself as the tenant of the premises. After the officers identified

themselves and explained the purpose of their visit, Valdez invited them to examine several paper bags containing defendant's clothing that were located in her garage. There, Detective Muir found defendant's May 9 letter to Gronley. Detective Muir believed that Valdez had authority to consent to an examination of the contents of the bags containing defendant's belongings.

Valdez testified she had given the officers permission to enter and to search three bags containing defendant's clothing that were stored in her garage. During much of May, defendant sanded and painted her kitchen. Defendant did not live there, but on a "couple" of occasions when he fell asleep while watching television, she covered him with a blanket and let him sleep there rather than awaken him. Defendant did not have a key, had to be let in each day, and did not receive mail at her residence. After he finished sanding and painting for the day, defendant would shower and Valdez would wash his clothes and place them back inside the paper bags. Defendant never told Valdez not to open the bags. Valdez did not learn defendant's last name until the officers informed her.

Defendant did not testify at the hearing. The trial court denied the motion to suppress evidence, finding, among other things, that Valdez had authority to consent to the search by the police.

■ The trial court ruled correctly. Although defendant asserted ownership of the contents of the bags, such an assertion is merely one factor in the determination whether he had a legitimate expectation of privacy therein. (*Rawlings v. Kentucky* (1980) 448 U.S. 98, 105 [65 L.Ed.2d 633, 100 S.Ct. 2556].) Significantly, defendant left these belongings in bags at a residence occupied by two other persons, knowing that one of them (Valdez) routinely placed his laundered clothing inside the bags, and he never instructed her not to do so. Accordingly, Valdez had access to defendant's personal effects sufficient to endow her with authority to consent to the search. ■ "[C]onsent of one who possesses common authority over . . . effects is valid as against the absent, nonconsenting person with whom that authority is shared." (*United States v. Matlock* (1974) 415 U.S. 164, 170 [39 L.Ed.2d 242, 94 S.Ct. 988]; see *People v. Jenkins* (2000) 22 Cal.4th 900, 976–977 [95 Cal.Rptr.2d 377, 997 P.2d 1044].) By permitting Valdez common access to the bags, and storing them at her home, defendant "assumed the risk" that Valdez "would allow someone else to look inside." (*United States v. Matlock, supra*, 415 U.S. at p. 171.) Regardless whether defendant is characterized as a mere invitee or as an overnight guest, he had no reasonable expectation of privacy in the bags with respect to Valdez, an occupant of the residence who consented to the search.

### 4. *Asserted mishandling of physical evidence*

Defendant contends the state's failure to honor discovery orders requiring the disclosure of physical evidence to the defense and to preserve and store the evidence properly, as well as the state's destruction of certain physical evidence, violated his right to a fair trial under federal principles of due process of law.

### a. *Factual background*

At the time of his arrest on June 1, 1986, defendant was wearing a bloodstained black jacket. In November 1988, in the trial court, defendant filed a "Motion for Sanctions for Failure to Properly Preserve Material Evidence" and in March 1989, filed supplemental points and authorities in support of that motion. Defendant asserted that the jacket should have been maintained in a frozen state to make it possible to perform more refined tests on the bloodstains at a later time. Defendant sought to exclude "all testimony regarding blood tests on the jacket."

At the May 1989 hearing on the motion, Sharon Binkley, a criminalist in the Alameda County Sheriff's laboratory, testified that she had received the jacket from the Hayward Police Department on June 5, 1986. She stored the jacket in a freezer "to slow down the deterioration of the genetic markers that can be found in the biological evidence." Subsequently, Binkley received known blood samples from the murder victim and from defendant.

At some point, Binkley examined the jacket and found human blood on the right sleeve. She cut out a portion of the bloodstained area and tested it for genetic markers. As a result of these tests, Binkley concluded that the blood on the jacket was consistent with victim Lorin Germaine's blood, but inconsistent with that of defendant. Performing the genetic marker typing consumed a portion of the bloodstain, and therefore Binkley did not retain the cut out portion she had tested. Another criminalist returned the jacket to the Hayward Police Department on September 29, 1986. It was not Binkley's practice, upon release of items of property, to advise the police how to maintain biological specimens, and she was unfamiliar with the provisions used by police departments for the storage of biological material.

Dr. Edward Blake, a forensic serologist and defense expert, testified that, on August 11, 1987, he received the jacket from Inspector McGrath. On September 11, 1987, Dr. Blake received blood specimens originating from the victim and from defendant. The prosecutor informed him that the jacket had not been maintained in a frozen state and that the material removed by Binkley was unavailable. Dr. Blake stated that, because of the jacket's black

color and the nature of the fabric, it was "very difficult to perceive whether or not there [were] any biological fluids dried onto the fabric."

Dr. Blake cut out a portion of the jacket adjacent to the area previously removed, and determined that it contained type A human blood. He was unable to perform more refined genetic marker tests, most likely because the sample had not been properly preserved or frozen. His tests would have sought to determine whether the excised bloodstain remained consistent with the victim's blood. Dr. Blake was furnished with a copy of Binkley's laboratory report and her notes. He found no inadequacy in her laboratory technique, nor any inconsistency between her report and her notes.

The trial court denied defendant's motion, finding "there was no suggestion or showing of governmental bad faith either by the Hayward Police Department or the Alameda County Sheriff's Laboratory, and the failure to refrigerate the evidence here . . . could at worst be described as negligent." The trial court further found that "while the failure to preserve the bloodstain and jacket evidence may preclude the defendant from obtaining comparable evidence by other reasonably apparent means, that evidence did not possess an apparent exculpatory value before the suggested failure to properly preserve but rather possessed upon completion of tests performed by criminalist Sharon Binkley an apparent inculpatory value."

### b. *Analysis*

The state has a duty to preserve evidence that both possesses "an exculpatory value that was apparent before the evidence was destroyed," and is of "such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*California v. Trombetta* (1984) 467 U.S. 479, 489 [81 L.Ed.2d 413, 104 S.Ct. 2528] (*Trombetta*).) Moreover, a constitutional violation is not established unless the authorities acted in bad faith in failing to preserve potentially useful evidence. (*Arizona v. Youngblood* (1988) 488 U.S. 51, 58 [102 L.Ed.2d 281, 109 S.Ct. 333] (*Youngblood*).)[12]

In the present case, the trial court properly found that because the bloodstain evidence was inculpatory rather than exculpatory at the time the jacket was returned to the Hayward Police Department, the *Trombetta* test was not satisfied. Therefore, any failure of the police properly to preserve the jacket in a frozen state did not constitute a violation of defendant's right to due process of law.

---

[12] Although *Youngblood* was decided after the events here in question, the decision applies to the present case. (See *People v. Hardy* (1992) 2 Cal.4th 86, 165 [5 Cal.Rptr.2d 796, 825 P.2d 781] [*Trombetta*, decided in 1984, "applies even to cases—like the present one—where the crime occurred prior to the enactment of" Prop. 8].)

Defendant asserts that, because the state had been aware of the inculpatory value of the evidence, "[b]y a parity of reasoning, the state had to be equally aware of the potential exculpatory value of the jacket. The absence of the victim's blood on the jacket would make it unlikely that Mr. Schmeck was the shooter." That reasoning, however, does not constitute the applicable test. The circumstance that additional, more refined testing possibly could have excluded the victim as the source of the bloodstain on the jacket worn by defendant does not suggest the evidence properly can be characterized as exculpatory.

Defendant contends that bad faith was evident in the asserted violation of a discovery order by the police. On June 19, 1986, defendant filed in municipal court a discovery motion that requested all physical evidence, and at the hearing he indicated that the parties had stipulated to a July 16, 1986 date for compliance. On July 16, the prosecutor explained, presumably referring in part to the bloodstains on the jacket, that the laboratory analysts had not yet completed their tests because a blood sample from defendant was required. The court continued to August 12, the date set for compliance with the discovery order. On July 24, the court ordered that a blood sample be taken from defendant. On August 12, the court observed that the parties still were waiting to receive certain laboratory reports, and continued to August 29, the date set for compliance with the discovery order. Subsequently, the court continued to September 12, 1986, the date set for compliance.

The reporter's transcripts of the hearings held on September 12, September 26, and October 24, 1986, have been destroyed. Nonetheless, at a hearing held on December 11, 1986, the prosecutor observed that at some point during that period, the laboratory report "regarding the blood" had been provided to defendant, and that the only item defendant still required was the "scientific lab work that provided the foundation for the report." The prosecutor indicated that those notes would be provided, probably the following day, and inquired, "Is there anything else in the way of discovery that the defense is requesting at this point?" Defense counsel answered, "Not that we know of. However, we would reserve the right to bring it to the Court's attention if something may come up from the very materials that the District Attorney has indicated he will furnish us tomorrow. We don't anticipate anything else." On December 18, 1986, defense counsel noted that at the last hearing the defense was notified that it would be provided with the lab notes of the blood analysis, and stated, "We now have received the entire contents of blood analysis that was done by the Alameda County Lab."

On May 11, 1987, shortly after defendant's arraignment in superior court, he filed a discovery motion that included a request for "all physical evidence." Defendant did not request the jacket, or note that he had not received the jacket, in the discovery request or in defense counsel's supporting declaration.

As noted, *ante*, on August 11, 1987, defendant received the jacket for testing. Defendant, who wore the jacket at the time of his arrest in June 1986, knew it was in the possession of the police, yet at no time during those hearings did the defense indicate it had not received the jacket; rather, the defense indicated it had received the related laboratory reports and notes. In sum, we conclude the record fails to establish any violation of the discovery order, let alone any bad faith on the part of the prosecution or law enforcement.

### 5. *Asserted instructional error and prosecutorial misconduct*

Defendant contends that so-called structural error occurred because the jury improperly was instructed that the state did not have to prove beyond a reasonable doubt that defendant was the killer, and because the prosecutor's opening and closing arguments included comments that reinforced the erroneous instruction.

The trial court instructed the jury regarding the difference between a confession and an admission, and that the jury was the exclusive judge whether defendant had made a confession or an admission and, if so, whether the confession or admission was true in whole or in part. The trial court also instructed the jury that evidence of an oral confession or admission by defendant should be viewed with caution unless it had been tape-recorded. The court further instructed: "Evidence has been received from which you may find that an oral statement of intent, plan or design was made by the defendant before the offense with which he is charged was committed. It is for you to decide whether such a statement was made by the defendant. Evidence of an oral statement ought to be viewed with caution." The court then read the challenged instruction: "No person may be convicted of a criminal offense unless there is some proof of each element of the crime independent of any confession or admission made by him outside of this trial. The identity of the person who is alleged to have committed a crime is not an element of the crime nor is the degree of the crime. Such identity or degree of the crime may be established by a confession or admission."

Defendant concedes that the "mere provision of these [corpus delicti] instructions itself is not enough to establish a 'reasonable likelihood' that the jury failed to apply the correct burden of proof to the issue of

identity." (See *People v. Frye* (1998) 18 Cal.4th 894, 959–960 [77 Cal.Rptr.2d 25, 959 P.2d 183].) Defendant insists, however, a reasonable likelihood existed that the jury did not apply the correct burden of proof, because in addition the prosecutor made two misleading statements. The prosecutor assertedly made the first during his opening argument, prior to describing the elements of robbery: "I represent the people of the state of California, I represent the society, the group of people that live in this state. And anyone who is accused of a crime has to be convicted beyond a reasonable doubt and to a moral certainty. And that's my responsibility to you, the jury. Each crime has certain elements, and each element has to be proved beyond a reasonable doubt or the crime fails. *The identity of a person who is accused of a crime is not an element of a crime.*" (Italics added.)

Defendant did not object to the prosecutor's statement or seek an admonition, and no exception to the general requirement of an objection is applicable; to the extent defendant claims the prosecutor committed misconduct by misstating the law, defendant has forfeited this claim on appeal. (*People v. Turner* (2004) 34 Cal.4th 406, 430 [20 Cal.Rptr.3d 182, 99 P.3d 505].) Moreover, defense counsel observed in closing argument that the prosecutor "says that identity of the perpetrator is not an element. He's correct in [that] it's not one of those steps or those elements that satisfy the particular crime. But what you are talking about is it's got to be the person that's on trial . . . . If that's not the person that did that crime then the crime is not applicable to that person. . . . [T]he People have not proved homicide against the defendant beyond a reasonable doubt." Indeed, the identity of the killer was the primary issue disputed at trial and in counsels' arguments to the jury.

The prosecutor made the second statement at the outset of closing argument, when he characterized as conjecture and insinuation defense counsel's argument attempting to persuade the jury that Jamie Gronley and Donald Willis had committed the murder, and then added, "If you are going to present a case that someone else committed this crime, you've got to put on evidence." Defense counsel objected and sought an assignment of misconduct, noting that "there is no burden on the defense. The burden is on" the prosecutor. The trial court reminded the jury that the statements of counsel are not evidence and that the court would instruct them "as to the law at the conclusion of the arguments."

 Despite any ambiguity in the prosecutor's statements, the trial court's instructions made clear that defendant's identity as the murderer had to be proved beyond a reasonable doubt.[13] (*Boyde v. California* (1990) 494

[13] Thus, with regard to circumstantial evidence, the jury was instructed that "each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt. [¶] A defendant in a criminal action is presumed to be

U.S. 370, 384 [108 L.Ed.2d 316, 110 S.Ct. 1190] ["[A]rguments of counsel generally carry less weight with a jury than do instructions from the court. The former are usually billed in advance to the jury as matters of argument, not evidence [citation], and are likely viewed as the statements of advocates; the latter, we have often recognized, are viewed as definitive and binding statements of the law"]; *Cupp v. Naughten* (1973) 414 U.S. 141, 146–147 [38 L.Ed.2d 368, 94 S.Ct. 396] ["a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge"].) In view of the parties' emphasis at trial upon the issue of identity, and the substance of the remaining instructions, we conclude there is no reasonable likelihood the jury would not have understood it must determine whether it had been proved beyond a reasonable doubt that defendant killed Lorin Germaine.

Defendant further contends that even if this asserted error "did not require reversal of the guilt phase verdict, it separately would require reversal of the death sentence." He observes that in arguing at the penalty phase against any lingering doubt, the prosecutor stated: "[A]sk yourself did they present any evidence, did they present any evidence to show that the defendant was not there? Did they bring in an alibi? No. Nothing. The evidence as you have . . . determined it, he's the killer." Nothing in the prosecutor's comment indicates that defendant's identity as the killer was not relevant to his murder conviction or to the penalty that should be imposed.

We have concluded that no reasonable juror would interpret the corpus delicti instruction or the prosecutor's argument during the guilt phase to mean that it was unnecessary to prove, beyond a reasonable doubt, defendant's

---

innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty. This presumption places upon the People the burden of proving him guilty beyond a reasonable doubt. [¶] Defendant is accused in count one of the information of having committed the crime of murder, a violation of Penal Code section 187. Every person who unlawfully kills a human being with malice aforethought or while engaged in the commission or attempted commission of robbery is guilty of the crime of murder in violation of section 187 of the Penal Code. [¶] If you are convinced beyond a reasonable doubt that the crime of murder has been committed by a defendant, but you have a reasonable doubt whether such murder was of the first or second degree, you must give the defendant the benefit of that doubt and return a verdict fixing the murder as of the second degree. [¶] Before you may return a verdict in this case, you must agree unanimously not only as to whether the defendant is guilty or not guilty, but also if you should find him guilty of an unlawful killing, you must agree unanimously as to whether he is guilty of murder in the first degree or murder of the second degree or voluntary manslaughter. . . . If you are not satisfied beyond a reasonable doubt that the defendant is guilty of the crime charged and you unanimously so find, you may nevertheless convict him of any lesser crime, if you are convinced beyond a reasonable doubt that the defendant is guilty of such lesser crime. [¶] If you find the defendant guilty of one or more of the crimes charged or a lesser felony offense, you must determine whether the defendant personally used a firearm in the commission . . . of such felonies . . . . The People have the burden of proving the truth of this allegation. If you have a reasonable doubt that it is true, you must find it to be not true."

identity as the killer. In view of our conclusions regarding the claims of instructional error and prosecutorial misconduct, we also reject defendant's related contention that this claimed instructional error and prosecutorial misconduct violated his federal and state constitutional rights to proof of guilt beyond a reasonable doubt and his Eighth Amendment right to a reliable determination of guilt and penalty.

### 6. *Asserted additional prosecutorial misconduct*

Defendant contends that the prosecutor committed other misconduct violating defendant's federal and state rights to due process of law and a reliable guilt and penalty phase determination. Considering his claims either singly or in combination, we conclude there was no prejudicial prosecutorial misconduct.

First, defendant contends the prosecutor committed misconduct in telling a prospective juror during *Hovey* voir dire that her vote was merely a recommendation as to penalty. We previously rejected this claim in considering whether that prospective juror erroneously was excused (see *ante*, at pp. 263–265), and reject the claim in the present context for the same reasons.

Defendant contends that during closing argument, the prosecutor relied upon the "failure of the defense to present certain evidence when the defense was kept from presenting the evidence by the prosecutor's own motion." During that argument, the prosecutor stated that the defense "conjecture[s] that I have some secret deal with Jamie Gronley about her sentencing on a felony matter that we didn't divulge out here in the open." Although defense counsel objected that he had made no such argument or statement, no objection was made on the ground that the defense had been precluded from learning about any deal the prosecution had made with Gronley. Thus, the claim is waived. It also is lacking in merit for the reasons stated in our discussion of defendant's similar claim regarding the assertedly improper limitation of the defense cross-examination of Gronley. (See *ante*, at pp. 277–279.)

Defendant also reiterates the claim that we rejected, *ante*, in considering the instructions on corpus delicti, that the prosecutor committed misconduct when he told the jury "that the state did not have to prove identity beyond a reasonable doubt." (See *ante*, at p. 287.) As discussed, *ante*, the prosecutor did not so inform the jury but rather stated that "[t]he identity of a person who is accused of a crime is not an element of a crime." As we have noted, defendant forfeited this claim by not objecting. Nor did the prosecutor's challenged comment during the penalty phase indicate that defendant's

identity as the killer was not pertinent to his murder conviction or to the appropriate penalty to be imposed. (See *ante*, at pp. 286–288.) For the reasons stated in our earlier discussion, we conclude that the prosecutor did not commit misconduct.

Defendant contends that on "numerous" occasions during argument the prosecutor referred to facts that were not in evidence. The prosecutor stated that "defendant saw John Germaine[,] and John and Dennis [Trede] look alike. . . . [D]efendant said 'Is that your brother?' [Trede said] No, it's not, it's a friend."[14] Defense counsel objected on the ground that the prosecutor was misstating the testimony. The trial court reminded the jury that the arguments of counsel are not evidence. Defendant notes that the trial court earlier had sustained (on the ground of hearsay) defendant's objection to Trede's testimony regarding what defendant had said to Trede. But defendant fails to demonstrate that the prosecutor's brief reference infected the trial with such unfairness as to render the subsequent conviction a denial of due process, or that the reference involved deceptive or reprehensible methods employed to persuade the trial court or the jury. (*People v. Ayala* (2000) 23 Cal.4th 225, 283–284 [96 Cal.Rptr.2d 682, 1 P.3d 3] (*Ayala*).)

Defendant raises the same claim regarding the prosecutor's comment on the order in which the bullets were fired. The prosecutor stated: "Now if you recall, the first two rounds did not penetrate the skull. Those were number 2 and number 3 here—." Defense counsel objected on the ground that the pathologist had testified she was unable to ascertain the order in which the bullets were fired. The trial court reminded the jury that the arguments of counsel are not evidence. The prosecutor next described the evidence supporting the ballistic expert's opinion, based upon certain assumptions, in light of the combined weight of the fragments that two shots were fired into the victim's scalp.

Defendant reiterates in this court his argument that the pathologist was unable to determine the order in which the bullet wounds were sustained. But in light of defendant's statement to Gronley that after defendant fired the first shot the victim grabbed his head, looked at defendant, and asked defendant what he was doing, it reasonably may be inferred that the victim sustained one or more superficial gunshot wounds before the fatal ones. In any event, the prosecutor's use of the word "first" was isolated, and his apparent point was to refer to the ballistic expert's conclusion that there were two bullet wounds in the victim's scalp, not one, regardless of the order in which those shots were fired.

---

[14] In an odd set of coincidences, it also appears that Dennis Trede closely resembled John Germaine (as did the victim, Lorin Germaine, John Germaine's brother).

Next, defendant contends the prosecutor's statement that the defense had "asked for and got [an instruction on] murder in the second degree" was not based upon the evidence. Defense counsel objected and sought an admonition. The trial court "advise[d] the jury they will be instructed on the law at the conclusion of the arguments of counsel." Defendant correctly observes there is no evidence who requested the second degree murder instruction, and in any event that information is irrelevant. Nonetheless, the comment was brief and probably not given any consideration by the jury, and defendant makes no attempt to demonstrate that it infected the trial with such a degree of unfairness as to render the subsequent conviction a denial of due process, or involved the use of deceptive or reprehensible methods to persuade the trial court or the jury. (*Ayala, supra*, 23 Cal.4th at pp. 283–284.)

Finally, defendant contends that the prosecutor's reference to gunshot residue was not based upon the evidence. During defendant's closing argument, in the course of challenging the thoroughness of the police investigation, counsel stated: "The fact that there is no evidence that when the defendant was arrested any attempt was made to find out if he had discharged the firearm, had powder burns on his clothes or his hands . . . ." Apparently in response, the prosecutor stated, "What if? That's pure speculation. What if. Did they take powder burns off the defendant's hands two days after a shooting? Can't." Defense counsel objected on the ground that "That's not in the evidence." The trial court reminded the jury that "the statements of counsel are not evidence." Defendant is correct in noting that no evidence was introduced regarding the ability to detect powder burns two days following a shooting, but in any event the prosecutor's comment was brief and cannot reasonably be viewed as having affected the verdict.

### 7. *Asserted additional instructional error*

#### a. *Instructions on consciousness of guilt*

Defendant contends that his murder and robbery convictions must be reversed because the trial court erroneously instructed the jury that defendant's false statements and attempts to suppress evidence, if any, could be considered as evidence of guilt.

The jury in this case was instructed, in the language of CALJIC Nos. 2.03 and 2.06, that any willfully false or deliberately misleading statements or efforts to conceal or destroy evidence on the part of defendant could be considered as a circumstance tending to prove consciousness of guilt.[15]

---

[15] The jury was instructed: "If you find that before this trial the defendant made a willfully false or deliberately misleading statement concerning the crimes for which he is now being tried, you may consider such statement as a circumstance tending to prove a consciousness of

Contrary to defendant's assertion, neither instruction was improper merely because the theory of the defense was that defendant assisted Donald Willis only after the murder and the robbery were committed and hence the defense theory already "presupposed commission of a crime." If found to have been made, defendant's false statements to the police disclaiming his involvement in the robbery of Lorin Germaine, and his attempt to wipe down and alter the murder weapon, were evidence of a consciousness of guilt of the robbery and the murder. As such, the evidence was relevant to a determination of defendant's guilt of those offenses, even though the defense conceded that other offenses were committed.

▆▆▆ Defendant also contends that these instructions allowed the jury to draw impermissible inferences. We previously have rejected this claim, and defendant fails to offer any persuasive basis for revisiting our prior decision. (*People v. Breaux* (1991) 1 Cal.4th 281, 303–304 [3 Cal.Rptr.2d 81, 821 P.2d 585] [nothing in CALJIC Nos. 2.03 and 2.06 compels the drawing of impermissible inferences].)

b. *Asserted failure to instruct on being an accessory after the fact*

Defendant contends that the trial court failed to instruct the jury on the crime of being an accessory after the fact, in violation of defendant's state and federal constitutional rights to trial by jury and due process of law, and his right under the Eighth Amendment to procedures ensuring a reliable guilt phase verdict.[16] We conclude that no such error occurred.

▆▆▆ Defendant concedes that the offense of being an accessory after the fact is not a lesser included offense to robbery and murder, and that he did not request an instruction to the jury regarding this crime.[17] We have held

---

guilt. However, such conduct is not sufficient by itself to prove guilt and its weight and significance, if any, are matters for your determination." The jury further was instructed: "If you find that a defendant attempted to suppress evidence against himself in any manner, such as by destroying evidence or by concealing evidence, such attempt may be considered by you as a circumstance tending to show a consciousness of guilt. However, such conduct is not sufficient by itself to prove guilt, and its weight and significance if any are matters for your consideration."

[16] Section 32 provides: "Every person who, after a felony has been committed, harbors, conceals, or aids a principal in such felony, with the intent that said principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that said principal has committed such felony or has been charged with such felony or convicted thereof, is an accessory to such felony."

[17] Despite that concession, in his reply brief defendant refers to "the lesser included offense of accessory after the fact." In view of his earlier concession, and the circumstance that defendant's briefs do not contain any analysis why the offense of being an accessory after the

that a trial court has no duty to instruct on an uncharged lesser related offense when requested to do so by the defendant (*People v. Birks* (1998) 19 Cal.4th 108, 136 [77 Cal.Rptr.2d 848, 960 P.2d 1073]) and, therefore, it is clear that the trial court did not err in failing sua sponte to so instruct on that point.

Nor, contrary to his assertion, was defendant deprived of an adequate opportunity to present his defense. The jury fully was apprised of the theory of the defense through defendant's statement to the police, the defense's impeachment of prosecution witnesses, and defense counsel's closing argument.

### 8. *Asserted juror misconduct*

Defendant contends that the trial court violated his state and federal rights to fair hearing and trial, and reliable guilt and penalty phase verdicts, by failing to hold an adequate hearing after learning that Juror D. N. committed misconduct in speaking to nonjurors about the case and prejudging it. Defendant further asserts that the error requires reversal of his conviction and the sentence of death.

#### a. *Factual background*

On November 6, 1989, the jury returned its guilt phase verdict. Prior to the commencement of the penalty phase, on November 15, defense counsel brought to the court's attention an alleged incident of juror misconduct, further filing on November 20, a written "motion for mistrial and new trial." In support of that motion, defendant attached the declarations of Bobby McGough and Ellis Williams.[18]

The trial court held a hearing on the motion on November 27. Mr. McGough testified that he knew Juror D. N. because at the time McGough lived on Dohr Street the juror lived across the street from him, and McGough had lived with Juror D. N.'s sister, J. N. McGough also had known defendant since 1985, when McGough brought his automobile to a body shop where defendant worked. At that time, McGough had a conversation with defendant about defendant's racism.

On a Thursday in late October or early November 1989, at approximately 11:30 a.m. or 12:00 noon, McGough, who previously had been convicted of four felonies, was in custody at court, waiting to appear for "multiple armed

---

fact is a lesser included offense to any of the charged offenses, we presume that this isolated reference was not intended to set forth a separate claim of error.

[18] Defendant also attached the declarations of defense counsel and a defense investigator that, as relevant here, contained inadmissible hearsay.

robbery and assault with a deadly weapon."[19] McGough testified that he noticed Juror D. N., called out to him, and then had a four-minute to five-minute conversation with the juror. McGough was on one side and Juror D. N. was on the other side of a door that had a screen on it. Ellis Williams, McGough's codefendant, also was present.

In their conversation, Juror D. N. told McGough, in a sentence that was interrupted and never was completed, that defendant "was giving him dirty looks, looks that consisted of racial—."[20] Juror D. N. also told McGough in the middle of the conversation that he "wasn't going to vote not guilty in terms of [defendant], that him and two other ladies were going to vote not guilty." [*Sic.*] At the end of the conversation, McGough told Juror D. N. "to go ahead and do what you gotta do." The conversation ended when a man told Juror D. N. and another woman who was about 12 to 18 feet away, "It's time to go in." On the same day McGough relayed this conversation to defendant during the lunch break.

Ellis Williams also testified at the hearing. Williams had one prior felony conviction, recently had pleaded guilty to five counts of robbery and "a few" counts of assault with a deadly weapon, and was awaiting sentencing on the latter charges. Williams testified that at some point while he and McGough were at court, McGough had a conversation with a Black juror, who was five feet seven inches or five feet eight inches in height and weighed approximately "150, 160 pounds." McGough had called out to the juror and inquired whether he remembered McGough "from when he used to date his sister." The conversation was two or three minutes and no more than five minutes in length. During the conversation, Williams left the area "for a minute or two." Williams did not see anyone standing near the juror during the conversation.

Juror D. N. also testified. Although the trial court encouraged counsel for both parties to suggest questions to the court outside the presence of the juror, the court conducted all of the questioning of Juror D. N. In response to questioning, that juror stated that during the course of the trial, he did not have any conversation with an individual incarcerated in a holding cell in the area of the jury deliberation room, or any discussion about the case with anyone who was inside a holding cell. At some point when the jurors headed down the stairs to the courtroom, Juror D. N. heard someone "hollering" something like: "The guy is innocent, the guy is innocent, he didn't do it." The juror could not tell who was yelling or to whom the comment was

---

[19] McGough ultimately pleaded guilty to "seven robberies and use of a gun and nine assaults with deadly weapons."

[20] In his declaration, McGough stated that Juror D. N., "who is black, told me that he thought the defendant looked at him 'funny' during the trial with dirty looks that Mr. [N.] took as racial prejudice against him by [defendant], who is white."

directed, nor could he recall whether the incident occurred during deliberations. The jurors never discussed the comment during deliberations. Juror D. N. knew that 10 to 15 years earlier his sister J. N. had dated someone named "Bobby," but the juror was not certain he ever had seen "Bobby" or whether he would recognize the person if he saw him. Juror D. N. stated that he had lived on Dohr Street. The court admonished Juror D. N. not to discuss the hearing or what had transpired at the hearing with anyone.

The trial court denied the motion for a mistrial and for a new trial, as well as defendant's request to discharge Juror D. N. The court found Juror D. N.'s testimony "more credible than that of the other witnesses. Further, as to the comments that Mr. [D. N.] testified that he heard, there is no sufficient basis to believe at this time, . . . that the juror's impartiality was affected, the defendant's case thereby prejudiced or harmed, the fairness of the trial affected or the verdict affected."

b. *Analysis*

In determining whether juror misconduct occurred, "[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence." (*People v. Nesler* (1997) 16 Cal.4th 561, 582 [66 Cal.Rptr.2d 454, 941 P.2d 87] (lead opn. of George, C. J.); see *People v. Pride* (1992) 3 Cal.4th 195, 260 [10 Cal.Rptr.2d 636, 833 P.2d 643] (*Pride*) ["we defer to the court's observations and credibility determinations" regarding whether misconduct occurred].) In the present case, the trial court credited the testimony of Juror D. N. over that of McGough and Williams, and found that no misconduct had occurred. Because that finding is supported by substantial evidence we defer to it.

Contrary to defendant's assertion, the hearing held by the trial court on this matter was adequate in dealing with the possibility of juror misconduct. Defense counsel reasonably was precluded from eliciting testimony from other jurors merely to ascertain whether anyone else observed the alleged conversation between Juror D. N. and McGough, or heard a voice "hollering" down the stairs. (See *People v. Hedgecock* (1990) 51 Cal.3d 395, 419 [272 Cal.Rptr. 803, 795 P.2d 1260] (*Hedgecock*) [evidentiary "hearing should not be used as a 'fishing expedition' to search for possible misconduct"].)

Defendant also contends the trial court abused its discretion in failing to hold a second evidentiary hearing on additional claims of juror misconduct following the penalty phase. In support of his motion for new trial, defendant submitted a March 24, 1990 declaration from Juror D. St. stating in relevant part: "I observed during deliberations a prisoner speak to [D. N.], another

juror, when Mr. [D. N.] and myself were in the hall outside the jury room. The prisoner yelled out hello to Mr. [D. N.] from behind a door with a screen, and Mr. [D. N.] went up to the door to talk to the prisoner. Mr. [D. N.] told me that the prisoner had dated his sister, and I joked with Mr. [D. N.] about who his friends were. Mr. [D. N.] did not speak with the prisoner about the Schmeck trial. I believe Mr. Schmeck received a just sentence and a fair trial."

We conclude that the trial court did not abuse its discretion in failing to hold a further evidentiary hearing. The trial court is required to hold such a hearing only when the defense adduces evidence demonstrating a "strong possibility that prejudicial misconduct has occurred," and generally a hearing is unnecessary unless there is a material conflict in the evidence presented by the parties. (*Hedgecock*, *supra*, 51 Cal.3d at p. 419.) Even assuming that a conversation occurred between Juror D. N. and the prisoner, whether Juror D. N. spoke to someone was not a material issue in the case, and evidence of any such conversation did not create a likelihood of prejudicial misconduct. Rather, the conversation, if one occurred, was relevant only if Juror D. N. spoke to a third person about the case, and the declaration expressly stated that the juror did not do so. Indeed, the trial court previously had held an evidentiary hearing to investigate assertions that the juror committed misconduct, and found no misconduct. Under these circumstances, the trial court acted within its discretion in declining to hold a second evidentiary hearing. (*People v. Brown* (2003) 31 Cal.4th 518, 582 [3 Cal.Rptr.3d 145, 73 P.3d 1137].)

### C. *Penalty phase*

#### 1. *Failure to discharge Juror D. N.*

Defendant contends that even if Juror D. N. did not engage in misconduct at the guilt phase, his reaction to the trial court's inquiry and to events subsequent to that inquiry demonstrated a significant risk that Juror D. N. was biased against defendant, and hence the trial court's failure to discharge that juror violated defendant's federal and state constitutional rights to a fair penalty phase and his Eighth Amendment right to a reliable penalty phase determination.

On November 16, 1989, while discussing the claims of misconduct by Juror D. N. to be considered at the hearing on November 27, 1989, the trial court stated that "out of an abundance of caution, I know it is not necessary

but there was discussion about declarations and the declarations to which the court was referring I hope obviously w[ere] declarations from the two prisoners set forth in [defense counsel] Mr. Meyer's declaration, and I know it need not be said. The jury has not been discharged and we were scheduled to proceed with the penalty proceeding and I'm not suggesting or directing that declarations be taken from sitting jurors. That is not to occur at this stage of the proceedings. I know I need not say this but I want to make sure there was no misunderstanding. . . . [W]e are clear on the issue of no contact with jurors I presume, Mr. Meyer?" Attorney Meyer responded, "Certainly clear with me."

On November 29, 1989, two days after the hearing and one day after the ruling on the motion for mistrial and new trial, the court clerk received a telephone call from Juror D. N. asking to speak with the trial judge. Juror D. N. was advised by the clerk to put any concerns in writing, and counsel were advised of his call. Later that same day, Juror D. N. delivered a letter to the court in which he inquired: "Is it lawful or unlawful for an investigator, an official, or any other persons from the office of the public defender to personally go to the residence of an immediate family member of a juror with no prior notice and question them off the record regarding matters related and/or not unrelated to this case on [sic] parties involved and parties not involved in this case? Do they have [the] right to question members of a juror's family regarding the juror's whereabouts such as where does he work? What church does he go to? Where does he live? Et cetera. If this should happen to a juror in a case such as this what should he or she do if approached by above officials? Is this to be expected in a case such [as] this?"

After receiving this letter, the trial court held a hearing on November 30, 1989, at which Juror D. N. and counsel were present. Juror D. N. testified that when his sister J. N. (the letter N signifies her former surname) telephoned him late on Tuesday night, November 28, 1989 (one day following the earlier hearing on the claims of juror misconduct), to invite him to a baby shower, he told his sister that if anyone asked for his address or telephone number, not to give them that information. J. N. replied, "It's a funny thing that you asked me that because somebody already came looking for you." On the telephone, and later in person, J. N. relayed to Juror D. N. that that morning, at approximately 9:00 or 9:30 a.m., a woman knocked at J. N.'s door. J. N. let her in, and the woman began to ask J. N. a series of questions, including whether J. N. had lived with Juror D. N. on Dohr Street. J. N. had answered, "No." J. N. was surprised that the woman had located her, because she had not used this last name for 20 years. The woman visitor was forceful, and J. N., who was nine months pregnant, asked her to leave. The woman responded that she had to obtain this information, and continued her series of questions, such as where Juror D. N. resided and

worked. At that point, J. N.'s husband entered the room because he had heard J. N. ask the woman to leave, and he said, "You're gonna have to leave, ma'am." The woman continued with her questioning, asking J. N. whether she knew Bobby or defendant. J. N. replied, "No, who are these people?" Her husband stated that all Juror D. N. did was "go to work and go to church," prompting the woman to inquire as to which church he attended. J. N.'s husband again asked the woman to leave, and she then wrote on a legal pad something to the effect that she "did not obtain any information." The woman then asked J. N.'s husband for his telephone number. He replied that they did not have a telephone number yet, and although they expected to receive one, he would not divulge that information to the woman, and he again asked her to leave. At that point, the woman gave J. N. a business card identifying herself as Elizabeth Litov, a senior investigator in the Office of the Public Defender.

After receiving this information from his sister, Juror D. N. had difficulty sleeping and wondered what was the proper thing to do in such a situation. He stated at the hearing: "That's why I wrote the letter. . . . Because I didn't want to jeopardize this case in any kind of way . . . . I wanted to know how I go about handling something like this if it happens to a juror."

The court assured Juror D. N. he had done the correct thing in bringing the incident to the court's attention. In response to the court's inquiry as to whether Juror D. N. could continue to be fair and impartial to both sides, he said, "Yeah, because . . . I want Mark and Mrs. Germaine to get a—I want to hear both sides basically. I can do that. I been like that since the beginning." The court asked, "And you continue to feel that way?" Juror D. N. said, "Yeah, uh-huh . . . It's no reflection on him." The court asked, "No reflection on the defendant?" Juror D. N. said, "No, huh-uh, Mark deserves a fair trial." The court subsequently asked, "Based on everything as you've described it that's occurred, is there any reason at all that you can't be a fair juror here and give Mr. Schmeck a fair trial?" Juror D. N. answered, "None whatsoever." The court asked, "And give the People a fair trial?" Juror D. N. replied, "None whatsoever."

The court also asked Juror D. N. about the earlier inquiry, held on Monday November 27, 1989: "Is there anything at all about the questions that I asked on Monday or that inquiry that you feel impacts your ability to be fair and impartial to both sides in this case?" Juror D. N. responded, "No, of course not." The court admonished Juror D. N. not to discuss the case, and not to discuss with any other juror anything that had occurred at the November 27 or November 30 hearings, or "anything about" his letter to the court. Juror D. N. said, "No problem."

Defendant moved to discharge Juror D. N. for implied bias. After hearing argument, the trial court denied the motion. The court noted that Juror D. N. consistently had stated "he could be fair and that what occurred was no reflection on the defendant, that the defendant deserved a fair trial."

 Pursuant to section 1089, when a trial court's denial of a motion to discharge a juror is supported by substantial evidence, it will be upheld. (See *Turner, supra,* 8 Cal.4th at p. 205.) In the present case, the trial court, which was in a position to observe Juror D. N.'s demeanor, found that the juror consistently had stated that he could be fair and did not harbor bias against defendant because of the conduct of the Public Defender's investigator. The trial court acted within its discretion in declining to discharge Juror D. N. Lacking any factual predicate, defendant's constitutional claims also fail.

The trial court also did not abuse its discretion in denying defendant's motion to discharge Juror D. N. after the first inquiry held on November 27, 1989. Juror D. N. specifically was asked whether anything in that inquiry affected his ability to be fair and impartial, and he responded in the negative. Although defendant asserts there was "a genuine risk . . . that [Juror D. N.] would believe the defense instigated the misconduct inquiry," such a concern is unfounded in view of the circumstance that the court, not counsel, conducted the examination. Substantial evidence supports the trial court's rulings.

### 2. *Asserted prosecutorial misconduct*

Defendant contends that misconduct by the prosecutor at the penalty phase violated his federal and state rights to due process of law and a reliable penalty phase determination. Considering the claims both singly and cumulatively, we conclude there was no prosecutorial misconduct.

 Defendant asserts that the prosecutor "attack[ed] the integrity of defense counsel, cast aspersions on defense counsel, [and] suggest[ed] that defense counsel ha[d] fabricated a defense." First, defendant notes that the prosecutor displayed for the jury a photograph of defendant taken at the time of his arrest, and commented that the defense had altered defendant's appearance at trial so that he did not look "like the dope dealing lying rat that he really is." Defendant did not object to this comment below, and no exception to the general requirement of an objection applies. Defendant therefore has forfeited this claim of error. (*People v. Boyette* (2002) 29 Cal.4th 381, 432 [127 Cal.Rptr.2d 544, 58 P.3d 391].) Moreover, the jury properly could be shown any differences between defendant's past and present appearance, and the prosecutor's remark constituted fair comment on such evidence. The prosecutor's remark came "within the bounds of the

'wide latitude' given to prosecutors during closing argument" at the penalty phase. (*Welch, supra,* 20 Cal.4th at p. 763; see *People v. Hawkins* (1995) 10 Cal.4th 920, 961 [42 Cal.Rptr.2d 636, 897 P.2d 574] [no misconduct in referring to the defendant as " 'coiled like a snake,' " or to life imprisonment for the defendant being like " 'putting a rabid dog in the pound' "].)

Defendant asserts that the prosecutor committed misconduct by stating: "Recall in the guilt phase that the defense counsel argued to you knowing well that it wasn't true that those blue Levi's were the trousers that the defendant was wearing when he murdered . . . Lorin Germaine. You know that that wasn't true. You know that the defense accused Jamie Gronley of conspiring to commit this murder with another person. Falsely accused her. You know that they tried to get the defendant off from being found guilty of first degree murder, robbery and the special circumstance. They didn't want him convicted at all." Defendant also objects to the prosecutor's comments that "you can't believe anything they tell you," and that defendant was "a coward. He wouldn't stand up to anyone but he would sneak up behind you. Maybe like they've been trying to sneak up behind you all telling you one lie after another and then asking you don't gas him." The defense did not object to the prosecutor's comments; no exception to the general requirement of an objection applies, and defendant's claim of error therefore is forfeited. (*People v. Turner, supra,* 34 Cal.4th 406, 430.)

We similarly view the prosecutor's comment that, "When [Defense Counsel] Judith Harris came out here and told you that it was tragic, but she doesn't care. She does not want you to give the defendant the death penalty notwithstanding that the severity of this crime, the severity of the circumstances and the defendant's past call for it clearly and loudly . . . ." Defendant did not object; no exception applies to the general requirement of an objection, and defendant's claim of error is therefore forfeited.

Defendant also claims that the prosecutor "suggest[ed] that defense counsel believe[d] his client [was] guilty or [did] not believe in his client's case." Defendant relies upon the prosecutor's statement, "There isn't one person in this room, not one, that has any doubt about the defendant's responsibility in this case." Defendant objected; the jury was admonished that the statements of counsel are not evidence, and the prosecutor moved on to a different topic. There is no reasonable likelihood that the jury understood the prosecutor's fleeting remark as referring to defense counsel.

Defendant next asserts that the prosecutor made misstatements of law. The prosecutor argued: "The question is . . . if the mitigating circumstances are substantially outweighing of the aggravating factors, then you can return a life in prison without the possibility of parole. If the mitigating circumstances

and the aggravating factors are equal, then you may return and must return a verdict of life without parole. But if the aggravating factors outweigh the mitigating circumstances, . . . you may return a death [*sic*]. When you do, the aggravating factors must so substantially outweigh the mitigating circumstances that it calls for the defendant's death." Defendant did not object to this statement; no exception to the general requirement of an objection is applicable, and defendant's claim of error is therefore forfeited. Moreover, the slight misdescription of the weight of the mitigating factors would not have misled the jury, in light of the other comments by the prosecutor and the instructions given by the court.

Nor did the prosecutor commit misconduct by stating that "sympathy is a factor both for aggravation and for mitigation if any." Defendant objected and sought an assignment of misconduct, and the court admonished the jury that it would be "instructed as to the law at the conclusion of the arguments of counsel." A jury properly may consider sympathy for the defendant in determining the weight of aggravating evidence, and that, apparently, is what the prosecutor meant. Shortly before the making the comment assigned as error, the prosecutor stated: "You—each and every one of you—are free to assign whatever moral or sympathetic value you deem appropriate to each and all—all includes the aggravating factors—to each and all of the various factors you are permitted to consider." Nor, contrary to defendant's contention, did the prosecutor "repeatedly [tell] the jury it could consider defendant's lack of remorse in determining if sympathy should be considered aggravating." Moreover, the jury was instructed: "While remorse is a factor you may consider in mitigation, you may not consider the absence of remorse as a factor in aggravation."

Defendant contends that the prosecutor "minimized the magnitude" of the penalty decision by referring to a statement by the philosopher Immanuel Kant that "The last murderer on earth has to be punished, the last, otherwise there is no justice." We previously have rejected the substantially similar claim that such a reference constitutes error under *Caldwell, supra,* 472 U.S. 320. (*People v. Young* (2005) 34 Cal.4th 1149, 1222 [24 Cal.Rptr.3d 112, 105 P.3d 487] [no *Caldwell* error in citing to Kant, because there was "no reasonable likelihood that the prosecutor's argument misled the jury regarding its responsibility in determining the appropriateness of a death sentence"].)

Finally, defendant asserts that the prosecutor improperly commented on defendant's decision not to testify at the penalty phase. Nothing in the prosecutor's closing argument reasonably can be so construed. Moreover, the jury was instructed at the request of the defense that defendant had a "constitutional right not to be compelled to testify at . . . the penalty phase,"

and that the jury "must not draw any inference from the fact that a defendant does not testify. Further, you must neither discuss this matter nor permit it to enter into your deliberations in any way."

### 3. *Asserted improper admission of facts underlying the Washington State prior conviction*

Defendant contends that the trial court's admission of the facts underlying his 1984 prior felony theft conviction in Washington State, and the prosecutor's reliance upon that evidence, violated his state and federal constitutional rights. Defendant is correct that the circumstances surrounding his prior conviction of nonviolent auto theft were inadmissible at the penalty phase. (§ 190.3, factor (c); *People v. Livaditis* (1992) 2 Cal.4th 759, 776 [9 Cal.Rptr.2d 72, 831 P.2d 297].) He did not, however, object on this basis below, and his claim of error therefore is waived.[21]

Nor did the prosecutor commit misconduct by referring to defendant's having stolen a car and been placed on probation. Defendant did not object to the prosecutor's argument, and no exception to the general requirement of an objection is applicable. Defendant's claim of error therefore is forfeited. Moreover, on the merits, it would be difficult under the circumstances to fault the prosecutor for simply referring to evidence that had been admitted by the court.

### 4. *The trial court's failure to inform defense counsel that the jury believed defendant had suffered two prior felony convictions*

Defendant contends that the trial court's failure to inform defense counsel that the jury believed defendant had suffered two prior felony convictions, and the court's failure to correct that misunderstanding, violated his constitutional rights under the Fifth, Sixth, and Eighth Amendments of the United States Constitution, and also violated section 1138.

At the conclusion of the penalty phase, the parties stipulated that the exhibits that had been received in evidence could be forwarded to the jury room upon the jury's request, without the need to convene court and inform counsel. During its deliberations, the jury sent the court a note that read: "We would like to see the wedding photo, and the two (2) f[e]lony convictions from the State of Washington."

---

[21] Similarly, we need not address defendant's further argument, made for the first time on appeal, that in admitting evidence of these underlying facts, the trial court violated the full faith and credit clause of the federal Constitution.

Defendant's prior conviction repeatedly was referred to in the singular, both by counsel in argument and by the court in instruction to the jury. Moreover, the prosecutor encouraged the jury to examine the two exhibits (Nos. 64-B and 64-C) documenting the prior conviction, in determining whether defendant had suffered that conviction. In light of such argument and instruction, the trial court may have interpreted the jury's note to signify simply that the jury wished to see those two documents. Because that interpretation was not unreasonable, and the parties had stipulated not to convene whenever the jury merely requested exhibits, it does not appear that the trial court erred in failing to notify counsel of the existence or content of the jury's note. Moreover, even had the jury believed, at the time it requested the exhibits, that defendant had suffered two prior felony convictions, it would have been disabused of that notion after it received and examined the documents that clearly reflected but a single prior conviction.

### 5. *Asserted admission of nonstatutory evidence in aggravation*

Defendant contends that the trial court's admission of nonstatutory evidence in aggravation regarding an uncharged burglary and theft, and the prosecutor's reliance upon that evidence in asking the jury to impose the death penalty, violated his state and federal constitutional rights and requires that he be granted a new trial as to penalty phase proceedings.

At the guilt phase, on cross-examination Jamie Gronley testified that she and defendant had entered defendant's aunt's residence when the aunt was not present and had stayed there for "a couple of weeks" until their arrest. The defense also called as a witness defendant's aunt, Monica Hall, who testified that she had telephoned the police because defendant and Gronley were in her house without her permission. Because that testimony was elicited by defendant, who did not object to it, defendant on appeal does not challenge its admission at the guilt phase.

Defendant asserts, however, that the evidence "had no place in the penalty phase" because it was not unadjudicated violent criminal activity that was admissible under section 190.3, factor (c). Contrary to defendant's assertion, there was no prosecutorial misconduct in referring to this guilt phase evidence during the penalty phase closing argument. At defendant's request, the jury was instructed that it could consider as a circumstance in mitigation, or in determining the appropriate sentence, evidence that defendant "has potential for rehabilitation and for leading a useful life while incarcerated in prison for life without the possibility of parole." In arguing that defendant was not amenable to rehabilitation, the prosecutor noted the residential break-in was one of many times that defendant had squandered the opportunities in his life. In making this argument, the prosecutor did not suggest that

the jury treat this evidence as aggravating evidence. Moreover, the jury was instructed that other than the alleged Washington theft conviction, "you may not consider any evidence of any other crime as an aggravating circumstance."

## 6. *Routine instructional and constitutional challenges*

Numerous pages of defendant's opening brief are dedicated to presenting generic claims that we repeatedly have considered and rejected in prior capital cases. Before we address those individual claims, we comment generally upon the briefing of these and similar generic claims.

Counsel for appellants regularly reassert such claims in this court, primarily in order to preserve them for review in federal court. (See *Vasquez v. Hillery* (1986) 474 U.S. 254, 257–258 [88 L.Ed.2d 598, 106 S.Ct. 617] [habeas corpus petitioner must have " 'fairly presented' " to the state courts what is, in "substance," the same claim upon which he is seeking federal habeas corpus review]; *Baldwin v. Reese* (2004) 541 U.S. 27, 29, 33 [158 L.Ed.2d 64, 124 S.Ct. 1347] [a federal habeas corpus petitioner complies with the exhaustion requirement by "alerting [the state] court to the federal nature of the claim"].)

Although a "fair" presentation is all that is necessary to preserve such claims, the briefing that this court often receives in capital appeals such as this one frequently contains extensive exploration and discussion that is unnecessary to preserve generic claims that we repeatedly have considered and rejected. The extensive nature of such briefing may arise from a perception that this court *requires* such a presentation and that, in the absence of such a presentation, the claim might be labeled by this court as "perfunctorily asserted"—thus possibly precluding both merit review in this court and subsequent federal review of such claims. Upon reflection, we recognize that certain language in a number of our prior decisions may have contributed to this perception.[22]

---

[22] See, for example, *People v. Mayfield* (1993) 5 Cal.4th 142, 196 [19 Cal.Rptr.2d 836, 852 P.2d 331] ("Defendant's constitutional claims largely are asserted perfunctorily and *without argument in support. Therefore we do not consider them.*"); *Turner, supra,* 8 Cal.4th at page, 214, footnote 19 ("We discuss those arguments that are sufficiently developed to be cognizable. To the extent defendant perfunctorily asserts other claims, without development and, indeed, without a clear indication that they are intended to be discrete contentions, they are not properly made, and are rejected on that basis."); *People v. Freeman* (1994) 8 Cal.4th 450, 482, footnote 2 [34 Cal.Rptr.2d 558, 882 P.2d 249] (same); *People v. Catlin, supra,* 26 Cal.4th at page 123, footnote 8 ("Defendant also claims perfunctorily that the admission of this evidence violated his right under the state and federal Constitutions to a reliable guilt and penalty determination. This claim, too, is waived and in any event is without merit."); *People v. Griffin* (2004) 33 Cal.4th 536, 589–590, footnote 25 [15 Cal.Rptr.3d 743, 93 P.3d 344] ("To the

 We take this opportunity to clarify that routine or generic claims that we repeatedly have rejected, and which are presented to this court primarily to preserve them for review by the federal courts, have been and will be deemed by this court to be fairly presented so long as the claim is stated in a straightforward manner accompanied by a brief argument. Such a claim is fairly presented even when the defendant does no more than (i) identify the claim in the context of the facts, (ii) note that we previously have rejected the same or a similar claim in a prior decision, and (iii) ask us to reconsider that decision.

We now turn to the numerous contentions of instructional error and deficits in the death penalty statute that defendant presents in order to preserve these claims for future review. We find none meritorious.

 The jury was instructed that before it could consider the alleged 1984 crime as an aggravating circumstance, "you must first be satisfied beyond a reasonable doubt that the defendant was in fact convicted of such prior crime." Defendant contends the trial court violated his Sixth, Eighth, and Fourteenth Amendment rights by failing to instruct the jury that it must agree unanimously that defendant had committed that crime. The court's instruction was sufficient. (*People v. Prieto* (2003) 30 Cal.4th 226, 263, 275 [133 Cal.Rptr.2d 18, 66 P.3d 1123]; *People v. Medina* (1995) 11 Cal.4th 694, 782 [47 Cal.Rptr.2d 165, 906 P.2d 2].) Nothing in *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428] affects our conclusions in this regard. (*People v. Prieto, supra,* 30 Cal.4th at pp. 263, 275.) Nor did the trial court violate defendant's Fifth, Sixth, Eighth, or Fourteenth Amendment rights in failing to instruct the jury that it must find beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors. (*People v. Cox* (2003) 30 Cal.4th 916, 971–972 [135 Cal.Rptr.2d 272, 70 P.3d 277].) Again, nothing in *Ring, supra,* 536 U.S. 584, mandates a different conclusion. (*People v. Cox, supra,* at pp. 971–972.) Nor does the death penalty statute as construed by this court fail to perform the narrowing function required by the Eighth Amendment. (*People v. Sakarias* (2000) 22 Cal.4th 596, 632 [94 Cal.Rptr.2d 17, 995 P.2d 152].) Section 190.3, factor (a), as applied, does not fail to sufficiently minimize the risk of wholly arbitrary and capricious action prohibited by the Eighth Amendment. (Cf. *Tuilaepa v. California* (1994) 512 U.S. 967, 975–980 [129 L.Ed.2d 750, 114 S.Ct. 2630]; *People v. Crittenden*

---

extent defendant claims that the trial court erred by refusing his request to instruct on the elements of murder [and other offenses], we dismiss his claim as 'not properly raised: it is perfunctorily asserted without argument in support.' [Citation.]").

(1994) 9 Cal.4th 83, 156 [36 Cal.Rptr.2d 474, 885 P.2d 887].) Nor do instructions in the language of CALJIC No. 8.85 violate the Eighth and Fourteenth Amendments by failing to delete inapplicable sentencing factors, delineate between aggravating and mitigating circumstances, or specify a burden of proof either as to aggravation (except for other crimes evidence) or the penalty decision. (*People v. Box* (2000) 23 Cal.4th 1153, 1217 [99 Cal.Rptr.2d 69, 5 P.3d 130].) Nor are potentially mitigating factors unconstitutionally limited by the adjectives "extreme" and "substantial," because section 190.3, factor (k), as expanded in *People v. Easley* (1983) 34 Cal.3d 858 [196 Cal.Rptr. 309, 671 P.2d 813], allows consideration of " 'any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime' and any other 'aspect of [the] defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death.' " (*Id.* at p. 878, fn. 10; see *People v. Yeoman* (2003) 31 Cal.4th 93, 165 [2 Cal.Rptr.3d 186, 72 P.3d 1166].) Defendant fails to specify or offer any argument as to which factors he concludes are "vague and ill-defined;" in any event, we do not perceive that any factors are so.

Defendant further contends that the death penalty statute violates international law, and that his death sentence therefore must be vacated. Defendant fails to point to any authority that "prohibit[s] a sentence of death rendered in accordance with state and federal constitutional and statutory requirements" (*People v. Hillhouse* (2002) 27 Cal.4th 469, 511 [117 Cal.Rptr.2d 45, 40 P.3d 754]), and we reject his claim.

### D. *Posttrial motions*

#### 1. *Asserted juror misconduct*

Defendant contends that the trial court's refusal to grant his motion for new trial or hold an evidentiary hearing after learning of alleged juror misconduct at the penalty phase violated his right to a fair trial under principles of due process of law, and his federal and state constitutional rights to the effective assistance of counsel, requiring reversal of his death sentence.

At the penalty phase, the jury was instructed that it was not "to speculate about whether or not there are circumstances that might preclude either a sentence of death or life without the possibility of parole from being carried out. In making the penalty determination in this case, you must assume that

whichever penalty you find to be appropriate for defendant is in fact th[e] penalty he will receive."

In support of his motion for new trial, defendant submitted the declaration of Juror J. M.[23] In opposition, the prosecution submitted the declarations of Jurors P. L., K. M., and D. St. We consider only those portions of the declarations that are relevant and whose admission in evidence did not violate Evidence Code section 1150, subdivision (a). (*People v. Danks* (2004) 32 Cal.4th 269, 298, fn. 9, 301–302 [8 Cal.Rptr.3d 767, 82 P.3d 1249].)

Juror J. M. stated: "In deliberations, it was discussed in the jury room by some jurors that the sentence of life imprisonment without the possibility of parole would not necessarily mean that Mark Schmeck would spend the rest of his life in prison. Several jurors discussed during deliberations that the defendant, if given a life without the possibility of parole sentence, could be released in the future. [¶] In the course of the penalty phase deliberations, the jury foreman raised the issue of a television program in which a prisoner who had been sentenced to life imprisonment without the possibility of parole came up for parole. This information was discussed by jurors during deliberations."

Juror P. L. stated that "[o]ne morning before all the jurors were assembled, one of the jurors mentioned a talk show about a prisoner, who was sentenced to life imprisonment without the possibility of parole, but was released and committed another crime. The Jury was not deliberating at this time and the subject was dropped and never brought up again to my knowledge." Juror K. M. stated, "[O]ne morning before we began deliberation there was a conversation which I overheard about a Television program 'L.A. Law.' The conversation was between Mr. [E.], Mr. [V.] and Mr. [F.]. That conversation was never discussed by any of the jurors in deliberations and was never part of the deliberations." Juror D. St. declared, "[O]ne morning during the Schmeck case, before the jurors were assembled and deliberating, a juror mentioned a television show about an unknown subject. I ignored it since it was not directed at me."

---

[23] Defendant also submitted the declaration of Lorelei Sontag, a capital case consultant for the Public Defender's Office. Sontag's declaration pertained to her conversations with Jurors D. St., K. M., and P. L., and noted that these jurors had refused to sign declarations regarding what they purportedly had told Sontag. The declaration solely contained hearsay or statements that violated Evidence Code section 1150, and therefore was of little evidentiary value. (*People v. Cox* (1991) 53 Cal.3d 618, 695, 697 [280 Cal.Rptr. 692, 809 P.2d 351].)

■ No juror misconduct occurred. The declarations suggest that either before or during deliberations, the jurors briefly discussed the possibility that defendant would be released despite any verdict of life imprisonment without the possibility of parole, and also discussed television episodes dramatizing such an event. As we have observed: "The court can, and here did, tell the jury that a life without parole sentence means just that, but no one can predict the future with certainty. No one, including a court, can *guarantee* that a person will never be paroled or otherwise get out of prison. The possibility that sometime in the future a person might be released, perhaps because of a change in the law, is a matter 'of common knowledge appreciated by every juror who must choose between a death sentence and a sentence of life without parole.' " (*People v. Steele* (2002) 27 Cal.4th 1230, 1264–1265 [120 Cal.Rptr.2d 432, 47 P.3d 225]; see *Pride, supra*, 3 Cal.4th at pp. 267–268 ["Defendant incorrectly suggests misconduct occurs whenever the jury, though instructed to consider only the evidence before it, nonetheless discusses speculative, irrelevant, and/or erroneous facts or opinions. . . . [¶] . . . The average juror undoubtedly worries that a dangerous inmate might escape"]; *People v. Cox, supra*, 53 Cal.3d at p. 696 [juror's reference to "former [California] Chief Justice Rose Bird and the fact 'that the death penalty had not been exercised in California since the 1960s' " was not misconduct in light of it being only "a single reference to factual matters of which the entire jury undoubtedly had some independent knowledge"].)

■ As we observed in *People v. Riel* (2000) 22 Cal.4th 1153 [96 Cal.Rptr.2d 1, 998 P.2d 969] in a similar context: "A prediction that the court would commute a death verdict, if in fact made, was merely the kind of comment that is probably unavoidable when 12 persons of widely varied backgrounds, experiences, and life views join in the give-and-take of deliberations. Not all comments by all jurors at all times will be logical, or even rational, or, strictly speaking, correct. But such comments cannot impeach a unanimous verdict; a jury verdict is not so fragile. 'The introduction of much of what might strictly be labeled "extraneous law" cannot be deemed misconduct. . . . Jurors bring to their deliberations knowledge and beliefs about general matters of law and fact that find their source in everyday life and experience. That they do so is one of the strengths of the jury system. It is also one of its weaknesses: it has the potential to undermine determinations that should be made exclusively on the evidence introduced by the parties and the instructions given by the court. Such a weakness, however, must be tolerated. "[I]t is an impossible standard to require . . . [the jury] to be a laboratory, completely sterilized and freed from any external factors." [Citation.]

Moreover, under that "standard" few verdicts would be proof against challenge.' [Citations.]" (*Id.* at p. 1219.)

We also conclude the trial court did not abuse its discretion in failing to hold an evidentiary hearing. Defense counsel expressly stated during the hearing on the motion for new trial that he had nothing to offer by way of evidence pertaining to this matter.

### 2. *Asserted erroneous ruling on automatic motion to modify penalty*

Finally, defendant contends that in ruling on his automatic motion to modify the death sentence (§ 190.4, subd. (e)), the trial court failed to consider the mitigating evidence introduced by defendant at the penalty phase. The trial court stated it was aware of its obligation to make "an independent determination whether imposition of the death penalty upon the defendant is appropriate in light of the relevant evidence and the applicable law." In addition, the court stated it had "examined and reviewed all the evidence presented to the jury, both in the guilt phase and the penalty phase, in making its determination as to the appropriate penalty," and "personally and carefully reviewed the transcript[s] and evidence as to the penalty phase of the trial." Immediately prior to denying the motion, the court concluded: "Considering all of the evidence and by independent review, the court's personal assessment is that the factors in aggravation outweigh those in mitigation and further the court independently finds that the evidence in aggravation is so substantial as compared to the evidence in mitigation that death is warranted and not life without possibility of parole."

■ Thus, read in context, the trial court's challenged comments such as "there are no factors in mitigation which will extenuate and mitigate the gravity of the crimes committed"—did not indicate that the court failed to consider the mitigating evidence presented, or that it considered such evidence "legally irrelevant." Rather, such comments indicate, as does the trial court's ultimate ruling, that the court "*considered* all of the evidence offered in mitigation; it merely found that much of that evidence did not, in fact, mitigate in light of the evidence as a whole." (*Smith, supra,* 30 Cal.4th at p. 640; *People v. Steele, supra,* 27 Cal.4th at pp. 1267–1268 ["Although the court must *consider* all proffered mitigating evidence, as this court did, it need not find that any particular evidence is in fact mitigating under the circumstances."].)

## DISPOSITION

The judgment is affirmed in its entirety.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.

Appellant's petition for a rehearing was denied October 12, 2005, and the opinion was modified to read as printed above.